SHELL OIL CO. v. STIFFLER et al.

No. 5512.  Decided July 19, 1935.  (48 P. [2d] 503.)

Rehearing Denied September 27, 1935.

See opinion denying rehearing, 87 U. 197, 49 P. (2d) 1150.

*Van Cott, Riter & Farnsworth* and *Grant Bagley,* all of Salt Lake City, for appellant.

*Thatcher & Young,* of Ogden, and *Dey, Hoppaugh, Mark & Johnson,* of Salt Lake City, for respondents.

MOFFAT, Justice.

The plaintiff, Shell Oil Company, brought this action against the defendants M. Ernest Stiffler and Edith Stiffler upon what is denominated in the pleadings, a "lease and consignment contract" and "service station lease." By the terms of the "service station lease" defendants leased to the plaintiff certain premises in Ogden City, Utah, upon a rental of $35 per month and 1 cent per gallon for each gallon of gasoline purchased from the Shell Oil Company over and above 3,500 gallons during such month. By the terms of the "lease and consignment contract" the Shell Oil Company subleased to the defendants, M. Ernest Stiffler and Edith Stiffler the same premises and appointed the Stifflers "agent" with the authority specified and limited in the contract. The agent was to conduct an authorized filling station for Shell products. The Shell Oil Company was to deliver and keep on consignment such quantities of gasoline and other motor fuel as the company may determine to be sufficient to meet the requirements for sales at the service station. The agent was to be responsible for all gasoline and other motor fuel delivered. The agent was to sell to cash customers at the retail price established by the company, pay all operating expenses, buy exclusively from the company, and do and perform a number of things, some further of which will be referred to later in this opinion.

Both documents evidencing the contract were prepared by the plaintiff, signed at one time, and will be treated as a single contract, and, except when separately referred to, will be referred to as the lease consignment service station contract. The rent was based upon the quantity of gasoline sold. Even the basic rent appears to be closely related to or based upon what, in the judgment of the parties, would be the minimum quantity of gasoline sold per month. The parties, except when referred to by name, will be referred to as plaintiff and defendants, respectively, except the American Petroleum Company, which company, when referred to, will be designated by name or as the corporate defendant.

From defendants' statement of the case, it appears the plaintiff seeks to enjoin the defendants Stiffler from purchasing or selling gasoline except such as is furnished by plaintiff. The controversy arises over what the parties refer to as "third structure" gasoline, or gasoline also referred to as "Green Streak Gasoline." Plaintiff's complaint is based upon the "lease and consignment contract." By answer, defendants interposed certain defenses, and by counterclaim sought to recover damages for breach of the contract. To meet this countercharge, plaintiff by reply set up what is referred to as a "waiver" or modification of the terms of the original contract.

Plaintiff and appellant asserts that every material fact involved in the cause is either admitted in the pleadings and stipulated by counsel in open court or is established by evidence free from conflict; and that the crux of the controversy turns upon the construction to be placed upon the written contracts between the plaintiff Shell Oil Company and defendants M. Ernest Stiffler and his wife, Edith Stiffler. Defendants do not controvert the statement. This eliminates all questions relating to evidence admitted or excluded over objection.

The corporate defendant, American Petroleum Corporation, may be disregarded, as judgment of the trial court was in favor of all the defendants, and the corporate defendant has not appealed, and neither party to the appeal has discussed any matters by which the corporate defendant is affected.

Certain equipment, such as gasoline pumps, gasoline storage tanks, oil and grease containers, and some incidental equipment, was furnished by the plaintiff. The defendants were to buy exclusively from the plaintiff and

"keep in stock for sale at said service station under the Company's trade marks and trade names adequate quantities of such lubricating oils, greases and other petroleum products as are marketed by the Company."

In so far as compensation, price, or other reference to what was to be paid or received is concerned, aside from the $35 per month rent and 1 cent per gallon above 3,500 gallons per month and the sale of oils and greases, the only reference to recompense is that the plaintiff company shall allow certain commissions on the gasoline sold. Whether the defendants were to receive a commission, or on what basis the oils and greases were to be sold or what profit was to be taken, does not appear, except defendants were to pay plaintiff "the Company's wholesale prices, unless otherwise stipulated by separate written contract, payment to be cash on delivery," and they were to exercise due diligence to promote and increase the sale of the company's products.

The parties operated under the arrangement without controversy from September 1, 1931, until the early part of February, 1932. At that time the plaintiff began to market what is called a new type or "third structure" gasoline, called "Green Streak." The "Green Streak" gasoline handled by the plaintiff in Utah was acquired by it from the Utah Oil Refining Company. The plaintiff declined to sell or supply defendants with the third structure or "Green Streak" gasoline as claimed by defendants upon two grounds: (1) That it was not included within the terms of the contract; and (2) that it was not gasoline.

The defendant M. Ernest Stiffler had presented to him by plaintiff what has been referred to as a waiver, modification or a supplemental contract and was advised that unless it was signed and accepted the plaintiff would not deliver to defendants any "Green Streak" or "third structure" gasoline. For a period defendants refused to sign the waiver or modification agreement and thereupon found that the cheaper grade or "Green Streak" was taking the market and defendants' business was dwindling. Finally, "under protest," as defendant M. Ernest Stiffler puts it, he alone signed the document which was in the form of a letter addressed to M. Ernest Stiffler and reads:

"San Francisco, Cal.
"Ogden, Utah, February 15, 1932.
"M. Ernest Stiffler, 23rd & Adams Avenue, Ogden, Utah.

"Dear Sir: We are about to commence the marketing of a third structure gasoline.

"This will confirm our mutual agreement that if any of such gasoline is delivered to you by us it shall not be deemed to have been delivered to you on consignment in pursuance of the Consignment Contract between us dated September 1st, 1931, but for all such gasoline which we may deliver to you, you will pay us in cash on delivery, our dealer net tank truck price for that grade of gasoline as posted on the date of delivery at our depot at Ogden, Utah, including all Motor Vehicle Fuel Taxes. We reserve the right to decline to deliver any of said gasoline to you at any time.

"Nothing herein contained shall be construed to impair the continued force and operation of the above mentioned Consignment Contract or of any valid supplement or modification thereof, but the same shall not be applicable to the delivery of third structure gasoline.

"No third structure gasoline delivered by us to you shall be taken into consideration in computing the amount of any rental or other periodical payment payable by us under any lease, or other agreement, of whatsoever nature with you.

"Please endorse a confirmation of your agreement with the foregoing on one copy of this letter, which is handed you in duplicate, and return to us the copy so endorsed.

"Yours very truly,

"AMD:DR  H                                    Shell Oil Company
        "AH                                          S. A. Dibble."
"Confirmed and agreed to M. E. Stiffler."

The defendants continued to purchase "Green Streak" gasoline from the plaintiff until about the middle of April, 1932, when by arrangement with the plaintiff, defendants secured the delivery of "Green Streak" from a Mr. E. A. Peterson who had a favorable contract with plaintiff whereby he was able to and did, according to an understanding with plaintiff, deliver "Green Streak" gasoline to defendants so defendants had the same margin as provided in the original "lease consignment service station contract." This arrangement soon terminated and Mr. Stiffler again demanded delivery of "Green Streak" gasoline by the plaintiff under the terms of the "lease consignment service station

contract." The plaintiff company declined to deliver. The defendants then began to purchase third structure or a cheap grade of gasoline from the American Petroleum Corporation. The gasoline purchased from that corporation was delivered by it and put into one of the gasoline tanks belonging to plaintiff on the leased premises. This gasoline was sold by defendants from the tank and by way of the pump, the property of the plaintiff, to the retail trade—the trade always being advised that such gasoline was not a product of the Shell Oil Company. The pump from which the gasoline purchased from the American Petroleum Corporation was sold, upon which the "Shell" name appeared, was painted over by defendants in an attempt to obliterate the name.

The trial court heard the evidence and refused to grant plaintiff any relief, granted the personal defendants judgment for damages on their counterclaim and directed plaintiff to specifically perform under the terms of the "lease consignment service station contract" of September 1, 1931.

The granting or refusal of an injunction, whether temporary or permanent, as a general rule rests in the sound discretion of the court under the circumstances and facts of the particular case. This court has quoted from the case of *Chambers* v. *Livermore*, 15 Mich. 381, 388, and approved the following:

"Specific performance, even of a binding contract, is not a matter of right; and a court of equity will refuse it, and turn the complainant over to his remedy at law, if not clearly satisfied that it embodies the real understanding of the parties." *Swanson* v. *Sims*, 51 Utah 485, 496, 170 P. 774, 777.

The record discloses facts and circumstances such that the application for injunctive relief, requiring defendants to desist from purchasing gasoline from any one other than plaintiff, is addressed to the conscience of the chancellor, and discloses such a situation that the chancellor "may, in the exercise of a sound discretion, either grant the prayer or deny it, as the facts and circum-

stances of the case may seem to require." *Melrose* v. *Low*, 80 Utah 356, 360, 15 P. (2d) 319, 320. This was done. It therefore follows that the judgment, in so far as it denied injunctive relief to the plaintiff, must be affirmed.

The trial court further entered judgment that the complaint of the plaintiff be dismissed upon the ground that plaintiff had no cause of action for injunctive relief. Injunctive or general equitable relief being the only relief sought by plaintiff, we are of the opinion there was no error in dismissing plaintiff's complaint.

The court, however, upon the counterclaim of defendants Stiffler granted their prayer, which was in the alternative either for specific performance or cancellation of the contract, to the extent of requiring specific performance and for damages. This situation presents more difficulty. The plaintiff's complaint was upon the "consignment service station contract." As hereinbefore stated, there were two documents but are herein, except when otherwise separately referred to, regarded as a single contract and we think should be so construed. In substance and effect it was a contract whereby the company agreed to sell and deliver all gasoline and other motor fuel, lubricating oils, greases, and other petroleum products marketed by the plaintiff company to the defendants Stiffler in such quantities as to be sufficient to meet the requirements for sales at the service station, which the defendants agreed to operate for a period of five years. The defendants also agreed during the life of the agreement to buy exclusively from the company and keep in stock for sale at the service station the petroleum products of the company. There were other provisions as to rents, description of premises, records, agency, diligence in operation, inspection, etc.

The proposition contained in the contract and upon which the construction of the contract turns, as maintained by both parties, revolves about the question of recompense or compensation the defendants were to receive for the opera-

tion of the service station for the exclusive purpose of marketing the petroleum products of plaintiff. As heretofore indicated, the trouble arose as to whether the so-called "Green Streak" gasoline was included in the original contract. Plaintiff maintains that it was not. Defendants maintain it was. Plaintiff's manager, when the question first arose, stated he was advised to tell service station operators that ";Green Streak" was not gasoline. They were then told "Green Streak" was not included in the contract. In an attempt to settle the matter, the plaintiff requested the signing of the modification agreement hereinbefore quoted, and refused to deliver gasoline under the contract to defendants unless the modification for exclusion of "Green Streak" and other provisions affecting compensation and payments were agreed to.

We are of the opinion the "lease consignment service station contract" by its terms reveals the intent of the parties was to include "Green Streak" gasoline as one of the "petroleum products marketed by Company." Notwithstanding what may have been said to the contrary, the record clearly discloses that it was gasoline; that it was a petroleum product; that it was a motor fuel; and that it was marketed by the plaintiff company. Paragraph 6 of the contract provides, among other things, that:

"To recompense the Agent for the Agent's expenditures herein contemplated and as compensation to the Agent (the 'Agent' refers to the defendants), the Company shall allow the Agent commissions as follows:

"(a) On each gallon of gasoline of Company's commercial gasoline sold 3c.

"(b) On each gallon of Company's Super Shell or specially blended gasoline or motor fuel sold 3c."

Plaintiff company argues that the contract provided for delivery and sale of but two brands or types of gasoline, viz., "Commercial" gasoline and "Super Shell" gasoline. Had it been the intention of the parties to so limit the products to be handled the plaintiff who drew the contract and

against whom it must be most strongly construed [*Continental Oil Co. et al.* v. *Fisher Oil Co.* (C. C. A.) 55 F. (2d) 14] could have limited the description to such brands as were known on the market by the specific trade names. It did not choose to do so. It would appear that the intention and purpose of the contract was to require the defendants to handle all petroleum products marketed by the company, and in order to bind defendants accordingly not only mentioned "commercial" gasoline and "Super Shell" gasoline, but also "specially blended" gasoline or "motor fuel" sold.

Because of the record as to the nature and character of "Green Streak" gasoline there would scarcely seem to be ground for argument, let alone the question of construction. The facts warrant the conclusion that such was the intention of the plaintiff when the contract was made. Plaintiff, by the express terms of the contract, was willing to bind itself to deliver to the defendants "all petroleum products marketed" by it. The construction put upon the contract by the trial court was correct. No error was committed in construing the lease and consignment contract to require the company to supply the "agent" with "Green Streak" gasoline.

We are thus brought to the question of the effect, if any, of the alleged modification agreement upon the status of the parties to the original "lease consignment service station contract." The action was brought upon the original contract which, if unmodified by Mr. Stiffler's signing in approval of the contents of the letter above quoted, was in full force and effect and would be breached at the time the plaintiff company refused to deliver "Green Streak" gasoline to defendant. If the signing of the letter modified the original contract, then what is the status of the parties? The complaint pleaded an unmodified contract. The allegations of the answer and counterclaim caused the plaintiff by reply to plead the alleged modification contract signed by Mr. Stiffler. The lease consignment service

station contract is joint in all of its terms and contemplates joint performance by the parties thereto. There are no several or joint and several provisions therein.

Subject to certain exceptions not present in the instant case, M. Ernest Stiffler, one of the joint promisors in the lease consignment service station contract, had no power to effect a modification of the contract without the consent of his joint promisor. There are neither pleadings nor proof that Edith Stiffler had consented to any modifications of the contract or by conduct or otherwise had consented thereto. There was no waiver or modification or estoppel as to both parties. Nothing is shown to make M. Ernest Stiffler the agent of Edith Stiffler to work a surrender of her right to performance of the contract as originally drawn.

It would seem to be fundamental that if the plaintiff company desired a modification of the contract or a waiver of any of its terms it was the duty of the plaintiff to secure assent thereto by all parties affected, otherwise abide by the contract as made.

There was no consideration moving from the plaintiff company to the defendants for the alleged modification or waiver of the provisions of the contract. Defendants contend that the supplemental agrement of May 13, 1932, is without legal force or effect because it is not supported by any consideration. Appellant contends that there was ample consideration. Section 75 of the Restatement of the Law of Contracts defines consideration thus:

"(1) Consideration for a promise is (a) an act other than a promise, or (b) a forbearance, or (c) the creation, modification or destruction of a legal relation, or (d) a return promise.

"(2) Consideration may be given to the promisor or to some other person. It may be given by promisee or by some other person." (Subdivision 2 is quoted not for applicability, but for complete statement of the definition.)

The case of *Prye* v. *Kalbaugh*, 34 Utah 306, 97 P. 331, 334, is cited by appellant as supporting the definition quoted

from the Restatement of the Law of Contracts, supra. Also the case of *Utah National Bank* v. *Nelson*, 38 Utah 169, 111 P. 907. In the former case the contract related to the sinking of a well for a specified sum, provided no rock formation was encountered. Rock formation, however, was encountered. It was then agreed that the work should proceed and that a reasonable compensation in addition to the originally stated compensation should be paid. It was held that after the work had been commenced the parties altered the contract, and that the plaintiff was entitled to recover the reasonable value for his work subsequently performed. The court in effect found and held that the modified contract was a new contract, and in passing upon the question of consideration, said:

"A new contract must, of course, have a consideration. But it is not essential that it should be 'a new or additional consideration' in the sense as was requested [referring to an instruction]. If the original contract is still executory on both sides either in whole or in part, and the parties in forming a new contract waive or release any liability created by the original contract, such waiver is a consideration for the promise of the party whose liability is thus released."

In the instant case the contract is executory on both sides. Here ends the analogy as well as the application of the rule to the case before us. Here no attempt was made to create a new contract, nor was one created. No waiver or release of a liability was made nor contemplated by the plaintiff in the alleged modification agreement. No consideration can be found bringing this case within the rule of the Prye-Kalbaugh Case above cited.

In the case of *Utah National Bank* v. *Nelson*, supra, the question arose over a consideration for a promissory note given to the bank at the request of a third party. The case falls within the second subdivision of the definition as given in the Restatement, supra. A number of the cases are collected and analyzed in the *Utah National Bank* v. *Nelson* Case.

Applying the definition of consideration, as above quoted from the Restatement of the Law of Contracts, as rigidly as may be, can it be said that the plaintiff promised anything—can there be found an act, a promised act, a forbearance—can there be discovered the creation, the modification or destruction of a legal relation? What return promise or bargain did the plaintiff bargain or bind itself to give in exchange for the claimed waiver, relinquishment, surrender of a right, or a promise on the part of the defendants? No additional act, not even a promise to act, other than or different from that found in the original agreement, can be found in the alleged modification agreement not found in the original agreement. There is no forbearance on the part of the plaintiff.

It is argued by appellant that by the provisions of the supplemental agreement the defendants were released and discharged of all duties, responsibilities, and expenses incident to the handling of the new gasoline. That they were released of the obligation of selling, storing, handling, accounting for, and maintaining the necessary facilities for disposing of the new gasoline, and the obligation to use their best efforts to promote its sale.

We are unable to make application of the argument as counsel does. The supplemental agreement provided:

"That if any of such gasoline is delivered to you by us it shall not be deemed to have been delivered to you on consignment in pursuance of the Consignment Contract between us dated September 1st, 1931, but for all such gasoline which we may deliver to you, you will pay us cash on delivery * * * We reserve the right to decline to deliver any of said gasoline to you at any time."

This statement would not seem to relieve or release the defendants from anything. If anything, it amounted to a reservation on the part of the plaintiff company either to deliver or not as it might elect and at a reduced price. To say that defendants were released of the obligation of selling and storing the gasoline is saying something not found in the supplemental agreement.

The alleged modification or supplemental agreement expressly continued in force the original contract, but attempted to make it inapplicable to third structure gasoline, yet gave to the plaintiff company the right to deliver or refuse to deliver, but required the defendants to receive, pay for, and sell the same and other petroleum products as provided in the original contract. There was no creation of a new legal relation between the parties, no destruction of the legal relation presently existing, and no modification in the sense of a changed legal status, no promise to do or refrain from doing anything the plaintiff was not already bound to do. The net result of the attempted modification of the contract was an indirect way of reducing the price of a part of the product plaintiff was bound to sell and deliver, with the privilege of selling and delivering or refusing to do so as the plaintiff might be moved or prompted to do. We are not overlooking the fact that incidentally the plaintiff was also to be relieved of applying the stipulated amount of rent to be paid on gasoline sold of the third structure grade. This does not help plaintiff's position.

It is stated in the case of *Montgomery County* v. *New Farley National Bank* 200 Ala. 170, 75 So. 918, that the modification of a contract of sale by merely remitting part of the price is without consideration. That mutual assent to such modification is not enough. The authorities are not in complete harmony. Many of the cases are distinguishable upon the facts. The differences arise principally out of the application of the proven facts to the law, or vice versa. A number of the cases are collected and considered by the Supreme Court of Alabama in the case of *Shriner* v. *Craft*, 166 Ala. 146, 51 So. 884, 886, 28 L. R. A. (N. S.) 450, 139 Am. St. Rep. 19. After referring to and applying the doctrine of the cases to consideration for modification of a contract, that court said:

"Other cases have gone a step further, and have held that, if one party finds himself in such a position that he cannot carry out the contract on the terms provided, and notifies the other party that he

will abandon the contract unless different terms are granted, said second party has the option either to let the contract be abandoned, and depend on his action for damages, or to make the new agreement, the consideration being that he considers it worth more to him to have the benefits of the new agreement, than to recover his damages for the breach of the original contract."

The facts of the case before us do not reveal a situation such as that outlined in the above quotation. In the case from which the above quotation is taken it is further said that the class of cases to which that doctrine has been applied has reached a dangerous limit by permitting one party to be bound by his promise to another who has promised nothing beyond what he is already obligated to perform under the contract.

Plaintiff concedes that the contract reasonably construed required it to deliver petroleum products to defendants in such quantities as to fairly and fully meet the trade demands of defendants. Defendants offered in open court to perform according to the terms of the original contract, or if the court thought specific performance would be a hardship upon plaintiff, to then terminate the contract entirely and leave the parties where they were before the contract was entered into. The plaintiff refused, insisting upon either cancellation of the "sub-lease-consignment" contract only or injunctive relief amounting to a requirement on the part of the defendants to specifically perform. "A court of equity is a court of conscience, and anyone appealing to or asking the aid of such court should come into it with clean hands" and be willing to do equity. *Swanson* v. *Sims,* supra. Likewise, anyone who seeks equity must be willing to do equity.

As to the question of damages, the court found specifically the quantities of gasoline sold by the defendants which were purchased from the American Petroleum Corporation after the plaintiff refused to sell defendants any "Green Streak" gasoline and upon which defendants suffered a loss of two cents per gallon. This quantity was found to be 21,324 gallons during the period from April 15,

1933, to August 24, 1933. It appears from the evidence that during the first part of the month of April defendants purchased "Green Streak" from plaintiff and the last part from the American Petroleum Corporation. What quantity was bought from each does not appear. It does appear, however, that during the months of May, June, July, and the first 24 days of August, defendants purchased from the American Petroleum Corporation 19,005 gallons of third structure gasoline which defendants sold to the trade at a price which limited the profit to 2 cents per gallon, while under the contract with plaintiff, the defendants were entitled to a 4-cent margin between the purchase price and retail price. The evidence as to any damage in excess of that amount is indefinite. Judgment was entered for $418 damages. Defendants did not prove damages in excess of $380.10.

We think the judgment should be reduced to the latter amount and when so reduced should be affirmed. Such is the order. Respondents Stiffler to recover costs.

ELIAS HANSEN, C. J., and FOLLAND, and EPHRAIM HANSON, JJ., concur.

WOLFE, Justice (concurring.)

I agree with the prevailing opinion that the so-called lease and consignment contract dated September 1, 1931, and the service station lease wherein the Stifflers leased to the oil company must be read together in order to penetrate into the real intent and purpose of the parties, but I confess that I cannot find in these instruments construed together, any express obligation on the part of the company to deliver to the Stifflers, its so-called agents, any gasoline or other motor fuel except as the company may determine. Paragraph 4 of the lease and consignment contract in part reads as follows:

"The Company shall maintain on consignment in the custody of the Agent at said service station such quantities of gasoline and other motor fuel as the Company may determine from time to time to be

sufficient to meet the requirements for sales at said service station. All such gasoline and other motor fuel so maintained on consignment in the custody of the Agent is to be and remain the property of the Company until sold as hereinafter provided, and thereafter the proceeds of all such gasoline and other motor fuel are to be and remain the property of the Company until fully accounted for and paid as hereinafter provided."

Paragraph 6 provides:

"The Company shall deliver into the custody of the Agent, without cost to the Agent, all gasoline and other motor fuel consigned to the Agent."

Later, in said paragraph, it provides that the agent shall be recompensed for his expenditures as agent and as compensation to the agent certain commissions, to wit, 3 cents on each agllon of commercial gasoline sold and each gallon of the company's supershell or specially blended gasoline or motor fuel sold. In connection with this compensation, paragraph 3 of the service station lease should be read. It states:

"The rental for the said premises shall be thirty-five ($35.00) dollars per month, and one cent per gallon for each gallon of gasoline purchased from the Shell Oil Company, over and above 3500 gallons, during said month."

The lease and consignment contract requires the agent to take the risk of losses except those which are caused by accident without fault on the part of the agent. It requires the agent to maintain the service station solely for storing and dispensing gasoline and other motor fuels of the company and oils and greases supplied by the company and to maintain a sign displaying conspicuously the words "Authorized Filling Station for Shell Products." The company is given the right to inspect the said service station at all times. The agent is required to keep a careful and accurate record which shall be open to inspection showing the amounts of gasoline and other motor fuel consigned to the agent and all sales thereof and the agreement provides that the company may provide forms and books for such record and that "The Agent shall account to the Company for sales

of all gasoline and other motor fuel and shall pay to the Company the total proceeds of sales, less commissions, on demand or at such regular intervals as may be indicated by the Company for that purpose." According to paragraph 5, "The Agent shall not dispose of any gasoline and other motor fuel of the Company except in strict accordance with the authority hereby conferred," although he is authorized to sell for cash to customers and make immediate delivery to them of "such gasoline and other motor fuel of the Company as may be in the custody of the Agent on consignment at said service station, but only at the retail price which may be established and specified by the Company from time to time therefor."

From what has been outlined above and from additional provisions not mentioned, the contract on the whole seems to be one of principal and agent rather than one for the purchase and sale of petroleum products, although it has some of the aspects of the latter, especially when we consider that the words "gasoline purchased" are used in paragraph 3 of the service station lease. However, construed altogether, I think these contracts do not give the company a free hand in determining just what petroleum products it shall deliver to its agent. In order to properly serve the public, the agent really has the right to require the company to deliver such of its products as the agent needs for such purpose; this for the reason that the agent's compensation and rent depends upon making sales of the company's products. Therefore, I think that it must be implied from the agreement that the company has an obligation to deliver as well as a right to deliver motor fuels. I think it can be implied on the whole that the company must keep the agent supplied with such of the company's products as are demanded by the public. This being so, I have very little doubt but that the agreement contemplated that the company should supply to its agent, subject to the commission of 3 cents on all gasoline sold, such motor fuel as it manufactured or marketed. This would include any new motor fuel,

especially gasoline, which was not known at the time the agreement was entered into, but which came into being later. It would include third structure gasoline, the trade name for the company's product of that gasoline being "Green Streak." The contract did not hold down the commission or the rental to particular brands of the company's gasoline known or manufactured by the company on September 1, 1931. It provided for a commission of 3 cents on each gallon of motor fuel sold. While it may be doubtful whether this would cover some new and entirely different motor fuel than came from petroleum, yet the agreement must be construed as to have contemplated any type of motor fuel which would come under the name of gasoline to be used as fuel in a motor and which is made by the refining, cracking, or distillation of crude petroleum.

Having come to the conclusion that the company is obligated to furnish the agent as well as the agent is obligated to take, keep, and dispose of petroleum products, we come to the next question as to whether the so-called modification of the lease and consignment contract made on February 15, 1932, is valid. I hardly think it necessary in this case to determine whether a modification of an agreement in this jurisdiction needs consideration. The reason I so think is because even though we should hold that a modification of an existing agreement can be made by the bare consent of the parties to the modification regardless of whether there is consideration, I think such consent must be had in an atmosphere of free dealing. Where one party is so situated that his business is under the domination of another, or where he may be coerced, a consent obtained by such coercion is not a free consent. Thus, in the instant case the Stifflers were so situated that if the company did not choose to deliver them certain products according to its contract, they had the alternative of either going outside and buying such products or of resorting to the courts to make the company comply—itself a devious remedy when time would be of the essence of the preservation of their business—or of

permitting the company to do in that regard as it pleased. If the consent to the modification of the agreement was obtained because the company imposed its will upon them against their own will through this economic situation and thus obtained a modification of the agreement which was detrimental to the Stifflers and beneficial to the company, I can hardly see how such compliance on the part of the Stifflers can be denominated a free consent. Therefore, even though we should hold that a modification can be considered as a waiver which only needs the intention to waive and no consideration, yet the waiver or the consent must not be accomplished by any coercion. It must be made in the atmosphere of a free choice.

I agree with the prevailing opinion, however, that in this case there was no consideration for the modification of the lease and consignment agreement. If a first party under an agreement is to do X acts in exchange for the doing by the second party of Y acts, a modification which permits the first party to do less than X acts when the second party must still do Y acts, has no consideration. In this case, as I study the modification agreement, it appears that the company was relieved of the obligation to deliver to the Stifflers all third structure gasoline except on terms much more favorable to the company than were provided by the original agreement. The Stifflers were not to obtain it as an agent, but were to pay cash on delivery and were to pay cash tank truck prices which would have given them a spread of about 2 cents instead of the 3 cents compensation, and furthermore, sales of third structure gasoline would not be taken into consideration in computing the amount of the rental due under the lease. That would make a difference in toto of 2 cents a gallon. If we should suppose a situation where the public practically cease buying the company's commercial gasoline or supershell or specially blended gasoline, then the Stifflers would have to depend upon the 2-cent margin in the third structure gasoline for all of their expenses and remuneration for their services. They could not have gone

elsewhere under the original agreement or modification to purchase gasoline even though they might have gotten better terms. Moreover, the company was under no obligation under the modification to deliver them third structure gasoline. The Stifflers were compelled to pay the dealer net tank truck prices for such gasoline as "we may deliver to you." The modification almost completely changed the situation of the Stifflers.

The company argues that there is consideration moving from the Stifflers because they are not charged with the onerousness of handling products which they desire to handle for their own benefit. That is a specious argument. As suggested by the defendants in their brief, a person who is to receive $200 rent per month, of course relieves himself of the enerousness of having to deposit $100 in the bank or deal with it if he takes $100 instead of $200 as rental under a modification, but that is hardly to be thought of as consideration for the less rental. In this case, the benefit which the Stifflers received under the original contract in the obligation of the company to deliver to them all types of motor fuel contemplated by the contract was the very essence of the consideration for making the original contract and to say "We will take away the benefits of this contract from you, and the consideration for you surrendering such benefits will be that you do not have to perform the transactions which are necessary or incidental to the handling of those products from which you receive your benefits," is casuistry.

As to that part of the prevailing opinion which holds that the lease and consignment contract of September 1, 1931, cannot be modified except by the joint consent of both Ernest Stiffler and his wife, who were parties to that contract, and who are termed "Agent" under said contract, I express no definite opinion. The agency set up was joint and made the Stifflers a unit either in a partnership or joint venture; their obligation to take and dispose of products was a unit obligation. Ordinarily what one would do in the business such as ordering gasoline or employing service station

attendants, or the like, would, under the joint venture or partnership theory, bind the other. This joint venture or partnership arises out of the contract made by both of them with the plaintiff. It may well be that a modification of this contract by one of the unit with the company without the signature or consent of the other would work a modification of the fundamental partnership or joint venture arrangement which the contract with the company gave rise to between the Stifflers. The reasoning of the prevailing opinion, therefore, seems reasonable that one could not so modify the fundamental agreement with the company so as to affect the contract between themselves which arose as a necessary concomitant of the contract between them and the company.

For the reasons above mentioned, I concur in the prevailing opinion.