[Civ. No. 14665.  First Dist., Div. Two.  Mar. 14, 1952.]

FRANKLIN LEHMANN et al., Appellants, v. MITCHELL
L. MITCHELL et al., Respondents.

Marcel E. Cerf, Robinson & Leland and Herbert Pothier for Appellants.

Shapro & Rothschild, Edward D. Keil, George A. Connolly and Herbert Chamberlin for Respondents.

THE COURT.—The owner of a building and his tenant are charged in this action with negligence resulting in the death of one Mathias Lehmann, who fell through a painted skylight of the building and was fatally injured. The trial court granted a nonsuit as to the owner and directed a verdict in favor of the tenant. From the judgments entered upon the granting of the motions the plaintiffs have appealed.

The building in question is located at 747 Market Street, San Francisco, and extends through to Stevenson, the next street to the south. It is a three story structure and is about 25 feet in width. Respondent Mitchell purchased the building in December, 1945, and in February, 1946, leased the ground floor, basement, and the rear portion of the second floor to respondent Dietz Bros., a corporation, as a location for a general food market. A refrigeration plant was already installed in the basement when Dietz Bros. took possession. This plant was connected with a water cooling tower on the roof. This cooling tower consisted of a superstructure down through which water from the refrigeration plant was spilled for the purpose of cooling to a metal tank at the bottom. After taking possession Dietz Bros. completely overhauled and remodeled that part of the refrigeration system in the basement. The changes made rendered the water cooling system on the roof inadequate and permission was obtained by the tenant from Mitchell, the owner, to go on the roof and remodel the cooling system so that it would function with the refrigeration part of the plant. This reconstruction was undertaken by George Windeler Company, employer of decedent.

A square galvanized metal air duct 30 by 30 inches crossed the roof from south to north at an elevation of 30 inches or thereabouts above the roof. This air conduit terminated approximately halfway across the roof from the south end. Two skylights were located northerly of the one through which the decedent fell and both were encased in housings to an elevation of 2 or 3 feet above the roof. The cooling structure of the refrigeration plant stood on the west side of the galvanized air duct and close to the west edge of the building. At the Stevenson Street end of the roof there was a brick firewall, and the wall of an adjoining building rose on the east side one or two stories higher than the roof. This wall was built almost against the Mitchell building.

The skylight with which we are concerned housed the elevator shaft in the rear of the building and sloped from an elevation of 19 inches on the east side to 8 inches on the west. From north to south it measured 60 inches, and from east to west 50 inches. Three panes of glass, each 20 inches wide, were installed in the top of the structure which was built out of wood with metal running up the sides.

The glass had been covered with a heavy coat of black paint in 1941 so that it would not show any glare or light from the interior in order to conform to the blackout, or air raid, ordinance of the city and county of San Francisco. On the day in question the paint was weathered, and there was some dirt and debris scattered over the surface of the skylight which gave it an appearance like that of the roof, the latter being of tar and gravel construction. The putty holding the glass was not painted, but it does not appear whether the putty had been replaced after the glass was painted or whether the painter had refrained from covering it at the time he coated the glass with the blackout paint.

The distance from the housing of the skylight to the wall on the east is 20 inches; and from the housing to the firewall on the south 18 inches. North of the skylight the distance from the galvanized air duct to the wall to the east is 72 inches. No guardrail was built around the skylight, nor was there any screen or other protective or warning device about or upon it.

On the morning of November 5, 1946, the Windeler Company sent the decedent with a helper named Mack Oller to the roof to dismantle and remove the old cooling system and install a new one. These men took the elevator up to the second floor and from there climbed the fire escape on

the Stevenson Street end of the building to the roof westerly of the air duct. They then proceeded to dismantle the water tower. In the meantime Lehmann had gone over to the wall on the east side of the roof and had erected a boom and pulley for lowering the wreckage to the street. After the tower was down Oller passed the old lumber and debris to the top of the galvanized air duct and Lehmann took it from there and piled it near the boom for lowering to Stevenson Street. The record does not disclose how much time was consumed in this sorting and piling process, but at noon both men descendeed to the street for lunch. At 12:30 Lehmann went back on the roof and Oller remained on the street. Lehmann started lowering the boards and other material from the tower while Oller took them off the pulley and put them on a truck. This procedure continued for something over an hour when Lehmann called down to Oller to send up a heavy rope and tackle as he was going to lower a tank.

About a minute, or a minute and a half, after the rope and tackle was sent up Oller heard a crash and upon walking over to the elevator shaft he found Lehmann's body. When he looked up, as he put it, he could see the hole in the roof through which Lehmann fell. The pane of glass on the north side of the skylight housing had given way and Lehmann had fallen through the opening to the floor of the elevator shaft.

No one witnessed the fall and the record is completely silent as to what took place on the roof between the time Oller sent up the block and tackle and when Lehmann fell. The photographs taken immediately after the accident disclose the heavy block and tackle and rope piled on the unbroken part of the skylight, and Lehmann's toolbox resting on the top of the galvanized air duct. These photographs also show the broken pane of glass and the construction and relative elevation of the skylight above the roof. With reference to what went on at the time the accident happened, the record discloses little more than these physical facts.

The use of the roof was reserved to Mitchell, the lessor, in his lease to Dietz Bros. In *Johnston* v. *De La Guerra Properties, Inc.*, 28 Cal.2d 394 [170 P.2d 5], it is stated at page 399 that "One who leases a part of the premises, retaining control of other portions . . . which the tenant is entitled to use, is subject to liability to persons lawfully on the land with the consent of the tenant for damages caused

by a dangerous condition existing on the part under the owner's control, if by reasonable care he could have discovered the condition and made it safe." Respondents have readily conceded that the status of Lehmann was that of a business invitee to whom each owed the duty to exercise reasonable care to see that the roof was in a reasonably safe condition to permit him to carry on the work he was engaged to do or else to give him warning of any hazard or danger which was not readily apparent. The respondents do not contend that the skylight did not constitute a dangerous condition on the roof or that the danger was not known to them. They take the position that the skylight by reason of its form, color and design was easily identifiable as such, and its danger was obvious to the decedent making his knowledge of the existing dangerous condition just as great as their own. It is also argued that nothing but his own negligence could have caused the accident.

■ Where death has ensued as a result of an accident thereby sealing the lips of the injured party and there is no evidence to disclose what transpired immediately prior to or at the time of the happening of the accident plaintiffs are entitled to invoke the aid of the presumption indulged in by law that the injured person was at the time using the requisite degree and amount of care necessary under the circumstances for his own safety. (*Wiswell* v. *Shinners,* 47 Cal.App.2d 156, 160 [117 P.2d 677].) ■ And upon a motion for a nonsuit, or for a directed verdict, the court may not consider any evidence tending to overcome it. For the purpose of either motion the presumption must stand uncontroverted and fully endowed with the weight and credence which the law bestows upon it as evidence. As is said in *Smellie* v. *Southern Pac. Co.,* 212 Cal. 540, 552-553 [299 P. 529]: "But when the rules applicable to nonsuit and directed verdict come into operation and we have a showing on behalf of the plaintiff of the facts and circumstances of the case and the presumption relied upon, on the one hand, and the evidence offered on behalf of the defendant, the evidence produced by the defendant and favorable to his cause is eliminated from consideration for the purpose of the ruling of the court."

■ A motion for a directed verdict like a motion for a nonsuit is in the nature of a demurrer to the evidence and concedes as true the evidence on behalf of the adverse party with all fair and reasonable inferences to be deduced

therefrom. ■ The court is bound to disregard all evidence in conflict with that produced by the plaintiffs. Not only is the court precluded from weighing the evidence of the defendant against that of the plaintiff, but the law does not permit it to judge of the credibility of the witnesses. ■ For the purpose of either motion, the court is bound to accord to the testimony of the witnesses produced by the plaintiffs all of the value attaching to the testimony of a witness who is to be believed (*Hunt* v. *United Bank & Trust Co. of Calif.*, 210 Cal. 108 [291 P. 184]).

The presumption that the decedent was using that degree and amount of care requisite for his own safety at the time of the accident eliminates all consideration of negligence on his part and it leaves for us to decide whether from the physical conditions existing on the roof as established by the evidence and the other substantial facts appearing from the record it may be reasonably inferred that the respondents were negligent in failing to place protective devices around or over the skylight, or otherwise warn of its dangerous condition when they knew that workmen would be occupied in the area. In the case of *Williamson* v. *Pacific Greyhound Lines*, 78 Cal.App.2d 482 [177 P.2d 977], at page 486, this court said: "Negligence and proximate cause have frequently been inferred from existing circumstances even when no question of nonsuit was involved and where circumstantial evidence was the only means of proof available to the injured party." And in the same case at page 485, it is said that: "Upon a motion for a nonsuit made at the conclusion of the plaintiff's case, the rule is almost axiomatic that the court is bound for the purpose of the motion to accept and treat as true every piece of evidence which tends to establish the plaintiff's case and to reject all which tends to disprove it. Every reasonable inference must be indulged in plaintiff's favor, and if two reasonable inferences may be drawn from the established facts, one of which is favorable to the case of plaintiff and the other unfavorable, that which is favorable must be accepted and that which is unfavorable rejected. If, in the present case, it may be as reasonably inferred from the proven facts that the defendant was negligent . . . as that it was not, the inference in favor of negligence must be drawn. Negligence in all cases is but an inference drawn from the proven facts, unless it is the result of a presumption (*Morton* v. *Manhattan Lunch Co.*, 41 Cal.App.2d 70 [106 P.2d 212]), and, upon

a motion for a nonsuit such as is here made, the law compels it to be inferred if it is reasonably possible to do so from the proven facts." To the same effect is *Knell* v. *Morris,* *(Cal.App.) 234 P.2d 1025. See, also, *Smellie* v. *Southern Pac. Co., supra; Estate of Lances,* 216 Cal. 397 [14 P.2d 768] ; *Estate of Flood,* 217 Cal. 763 [21 P.2d 579] ; *Wiswell* v. *Shinners, supra.*

▇ Since the respondents do not contend that the skylight did not present a dangerous condition but contend only that it should have been obvious to the decedent in the exercise of ordinary care that it was a skylight fraught with the danger of an elevator shaft below, we are brought to a consideration of the effect of the blackout paint upon the structure as a concealment or deception as to its true character. Respondents contend that the paint did not conceal the identity of the glass although it was applied for the purpose of preventing any ray of light from passing through it. Just how the decedent might ascertain that the structure was housing an elevator shaft with a bottom some three stories down without making a detailed examination is not pointed out by respondents.

Appellants contend on the other hand that the heavy blackout paint concealed the glass and hid its true identity. They add that the fact that it was weathered coupled with the fact that there was considerable debris scattered over it gave a deceptive appearance of structural durability and point to the heavy block and tackle lying on the unbroken part of the glass as proof that Lehmann was actually deceived by its appearance.

Either contention calls for the deduction of an inference, and under the well established rule as announced in the Williamson case, *supra,* the inference favorable to the plaintiffs must be accepted.

Furthermore the physical facts as a whole furnish substantial grounds for the inference that both respondents were negligent in not protecting or warning the workmen who they knew would be on the roof against the danger of falling into the elevator shaft through the skylight.

Respondents make the further point that the proven facts are different from those alleged in the complaint and that the variance is fatal. However, they do not point out wherein they have been misled by the claimed variance. ▇ As is

---

*A hearing by the Supreme Court was granted on Oct. 18, 1951.

said in the recent case of *Hayes* v. *Richfield Oil Corp.,* 38 Cal.2d 375, 382 [240 P.2d 580] : ''A variance between the allegations of a pleading and the proof will not be deemed material unless it has actually misled the adverse party to his prejudice in maintaining his action or defense on the merits . . .'' It is not indicated that either respondent has been misled as to the real issues of fact involved in the case.

Since the judgments appealed from must be reversed upon the grounds stated, we need not discuss the other points raised by appellants.

Each of the judgments is reversed.

A petition for a rehearing was denied April 12, 1952, and respondents' petition for a hearing by the Supreme Court was denied May 12, 1952. Schauer, J., was of the opinion that the petition should be granted.