127 Cal.App.2d 44 (1954)
DAN SAXON PALMER et al., Respondents,
v.
MAX BROWN, Appellant.
Civ. No. 20263. 
California Court of Appeals. Second Dist., Div. Two. 
Aug. 4, 1954.
 Adelman, Schwartz & Ferguson and Isaac E. Ferguson for Appellant.
 A. A. Rotberg for Respondents.
 FOX, J.
 In this action to recover for architectural services, with a cross- complaint raising issues of fraud, negligence and illegality of contract, defendant appeals from an adverse judgment.
 Plaintiffs, Dan Saxon Palmer and William Krisel, copartners, brought this action to recover $2,190.01 as the balance claimed to be due for architectural services rendered to defendant. Count one of the complaint alleged, in part, the execution of a written contract whereby plaintiffs, as a copartnership, agreed to render various architectural and professional services to defendant in connection with the design and erection of a "medical and professional" building, and defendant promised to pay for such services a fee of 5 1/2 per cent of the total cost of the building; that plaintiffs performed all of the terms of the agreement; that the building erected pursuant to the plans and specifications provided by them cost $75,736.17; that plaintiffs received only $2,785.11 from defendant, leaving an unpaid balance of $1,380.38 due and owing; *47 that due to the default of the contractors employed by defendant, plaintiffs were required by defendant to render extra services of the reasonable value of $510; that plaintiffs also rendered additional architectural services at defendant's request consisting of the preparation of designs, plans and specifications for the erection of sales booths of the reasonable value of $299.63; that between May 28, 1950, and December 6, 1950, the name of plaintiff Dan Saxon Palmer appeared on all instruments as architect and William Krisel was not designated as an architect. Count two alleged defendant's indebtedness for architectural services on an open book account.
 To this pleading, defendant responded with an answer and cross-complaint. So far as here material, the answer denied liability for the extra and additional services; denied that any sum was owing plaintiffs for architectural services; and alleged the invalidity of the contract between defendant and plaintiffs inasmuch as at the time of its execution William Krisel, who was then unlicensed, represented himself to be an architect; that Krisel, while so unlicensed, prepared most of the drawings and performed most of the supervision of the construction and subsequently signed, as an architect, a certificate for payment of $14,250 to the contractor which defendant paid in reliance on the representation that Krisel was an architect.
 The cross-complaint, in four counts, was to the following effect:
 Count 1: To recover damages of $20,000 by virtue of the fact that plaintiffs fraudulently issued certificates to the contractors showing satisfactory completion of work without ascertaining whether the premises were free from liens chargeable to the contractors;
 Count 2: To recover damages of $20,000 for plaintiffs' negligence in issuing certificates to the contractors without requiring proof that the premises were free from liens chargeable to the contractors and without carefully examining the work to see that it had been properly done;
 Count 3: To recover $2,785.11 previously paid to plaintiffs on account of the employment contract, which was allegedly void, defendant not having been notified in writing prior to the making thereof that Krisel was not a licensed architect, as required by section 5537, Business and Professions Code;
 Count 4: This count, as amended, was for the recovery of $14,250 as damages caused when, on October 27, 1950, Krisel *48 signed as architect a certificate of payment in this amount for the contractors, knowing it was not then due, and at which time he was not a licensed architect, a fact unknown to defendant when he paid the contractors.
 A demurrer to the third count of the cross-complaint was sustained without leave to amend. Plaintiffs' answer denied generally the allegations of the first and second counts of the cross-complaint. As to the amended fourth count, plaintiffs admitted that on October 27, 1950, Krisel was not a licensed architect when he issued the certificate of payment, but alleged that it was issued "in advance of the time specified" at defendant's request. On the issues thus framed, the cause was tried before a jury, which returned a verdict in favor of plaintiffs for $1,497.03 and found also for plaintiffs on the cross-complaint.
 The record discloses that on March 28, 1950, plaintiffs and defendant entered into a written contract under which plaintiffs were to design and supervise the construction of a two-story building which defendant intended to erect. At the time the contract was signed, plaintiffs were doing business as a partnership consisting of Dan Saxon Palmer, a licensed architect, and William Krisel, who was not licensed. Krisel did not receive his architect's license until October 28, 1950. The partnership name was:
 "Dan Saxon Palmer, Architect"
 William Krisel Associate""
 and under this style, was referred to as "the Architect" in the "Standard Form of Agreement between Owner and Architect" executed by the parties. Both Palmer and Krisel signed the contract for the partnership. When Krisel was licensed in October, the partnership name was changed to "Dan Saxon Palmer & William Krisel, Architects."
 Section 1 of the contract, entitled "The Architect's Services," reads as follows: "The architect's professional services consist of the necessary conferences, the preparation of preliminary studies, working drawings, specifications, large scale and full size detail drawings, for architectural, structural, plumbing, heating, electrical, and other mechanical work; assistance in the drafting of forms of proposals and contracts; the issuance of certificates of payment; the keeping of accounts, the general administration of the business and supervision of the work." (Emphasis added.)
 On July 5, 1950, defendant made an agreement with The Riking Corporation and one Joel T. King, as contractors, for *49 the construction of the medical building. The contractors agreed to furnish all materials for, and perform all work on, the building according to the drawings and specifications prepared by "Dan Saxon Palmer--Architect, William Krisel--Associate." The time for completion of the work was fixed at November 5, 1950, and the sum of $57,000 was set as the contract price.
 Plaintiff agreed to a schedule of progress payments to the contractors, payable on certificates of the architect. [fn. 1] The contract provided also that "before issuance of the final certificate, the contractor shall submit evidence satisfactory to the architect that all payrolls, material bills, and other indebtedness connected with the work have been paid."
 The "general conditions" of the contract, consisting of 44 articles, included the following:
 "Art. 24. Applications for payments.--The contractor shall submit to the architect an application for each payment, and if required, receipts or other vouchers showing his payments for materials and labor, including payments to subcontractors as required by Art. 37 ..." In article 37, dealing with "relations of contractor and subcontractor," the contractor agreed that upon payment of certificates the contractor would make payment to the subcontractor in proportion to the value of the subcontractor's contribution to the work for which the certificate was issued. By article 26 the architect was authorized to withhold or nullify a certificate in order to protect the owner from loss because of failure of the contractor to make payments promptly to subcontractors or for material and labor, or in case of reasonable doubt that the contract could be completed for the balance then unpaid. [fn. 2]
 The evidence shows that the plans for the building were drawn by Krisel while he was unlicensed but that they were all checked by Palmer, the licensed member of the partnership. There were placed in evidence copies of the final working *50 drawings and specifications which plaintiffs had prepared in connection with the design of the medical building (known as Job 906) and the sales booths (Job 911). The originals thereof, which were filed with the Department of Building and Safety, had been destroyed by the city after the certificate of occupancy was issued. Palmer testified that such final working drawings and specifications constitute "instruments of service." The record shows that each sheet of these final drawings and specifications, with respect to the legend bearing the name of the architect, was identical. This legend read as follows:
 "Dan Saxon Palmer--Architect"
 William Krisel--Associate
 1072 Gayley Ave Los Angeles 24." [fn. 3]"
 and was referred to by Palmer as "our title."
 As the work of construction of the medical building progressed, certificates of payments were issued the contractors, Joel T. King and Riking Corporation, upon a special form provided for that purpose. Near the lower right hand corner of this form was a ruled line for a signature, beneath which appeared the word, "Architect." Between July 27, 1950, and October 6, 1950, four such certificates were issued for the aggregate sum of $31,250, each of which have Palmer's signature as architect in the space last described. These were all honored and paid by defendant.
 As noted, the contract provided that the fifth payment, 25 per cent of the contract price, was to be made "[w]hen plaster is approved by L. A. City and architect." Krisel testified that on October 27, 1950, he received a telephone call from defendant "saying that Joel King needed some money and would be pleased to get a payment on the plaster if we had inspected it and if it had been approved; and I said Yes, and he said, 'He is on his way over now. Will you please issue him a certificate for the amount specified in the contract?' " Krisel stated that when King came over he gave him a certificate of payment. This certificate, in the sum of $14,250, bears the date October 27, 1950, the day before Krisel received his license, and was signed by Krisel as "Architect." Palmer testified that he did not direct Krisel to make out this certificate, although he stated he knew that Krisel was issuing it. The certificate bore the following notation: "For plastering *51 at the end of brown coat." At the time it was issued the final plastering had not been approved by the city inspector. On Nov. 19, 1950, Palmer issued a certificate for $1,000 on which appeared the following: "This is an advance payment on the certificate for payment on completion." Defendant testified that he never requested either Palmer or Krisel to issue any of the certificates but had empowered his secretary to pay all certificates which were presented to her signed by the architect.
 Palmer testified that prior to the issuance of the certificates, plaintiffs did not require from the contractors any proof that the money was being used by them to pay for material and labor furnished for the job. Defendant introduced evidence showing that between January and June of 1950, plaintiffs supervised the construction of an adjoining building for defendant which was erected by the same firm of contractors. On this job, Palmer issued ten architect's certificates of payments to Joel King, eight of which recited either that he had received his releases or that King had actually paid out the amount authorized. Palmer also testified that while he was superintending King's construction of defendant's medical building, the firm of Palmer and Krisel was employed by King and Riking Corporation "to do an apartment building." Plaintiffs submitted periodic bills to Riking for this work and received payments therefor.
 Near the end of November, 1950, it was discovered that some of the subcontractors were not proceeding with their work. An investigation disclosed that their cessation of work was due to nonpayment of their accounts and that King and Riking were financially unable to complete their performance and owed more on unpaid bills than the balance payable to them under the contract. On December 19, 1950, defendant gave notice of termination to the contractors, because of their default.
 After the default by King and Riking Corporation, defendant, as owner, let the balance of the contracts required to finish the building and paid directly to these individual contractors the amounts of their bills. Since no general contractor was on the job, plaintiffs took over the responsibility of supervision of the remaining work, and for these additional duties they predicate their claim for $510 extra compensation. A statement by a certified public accountant indicates defendant was compelled to pay $72,409.28 to complete the building, or over $15,000 in excess of the contract price. *52
 Kenneth Rottger, the bookkeeper employed by King and Riking, testified that up to November 30, 1950, only $27,391.33 of the bills chargeable to the medical building had been paid by the contractors, in contrast to the sum of $45,000 (excluding the advance payment of $1,000 on November 14) paid them by defendant on the architect's certificates. Rottger was examined by the trial judge on the question of what the unpaid bills were at the time each of the architect's certificates, through October 27, 1950, was issued. Rottger testified that his records did not reflect specifically the amounts of the unpaid bills at the particular time the certificates were issued, but stated he knew "that all the Riking Corporation's accounts payable were past due as of October 27th."
 Defendant's assistant, Krasik, testified to alleged defects in the construction of the building for which it was sought to hold plaintiffs responsible. These included:
 (a) Stairway landing. The landing was welded to the floor joists by a structural steel company during the early part of the job and approved by the architect as part of the rough framing. The stairs were installed after the default, and only then was a slope in the top landing discovered which caused trouble with the doors. Krasik testified that this defect could not be noticed during construction.
 (b) Dex-O-Tex matting. This matting developed cracks which Krasik attributed to the fact that the underlying steel was not sufficiently rigid. It was installed under a sub-contract made directly by defendant after the general contractors defaulted.
 (c) Exterior stair treads. These were composed of laminated pieces of wood glued together and covered with steel plates. The steps subsequently rotted. Krasik asserted that Palmer assured him the glue was waterproof and would cause no difficulty.
 (d) Floors off-level. When the building was completed, the floors appeared level. About six months after the building was completed, a sagging in the floors of some of the offices came to light.
 After the default, defendant obtained $5,500 from security given by King in lieu of a performance bond.
 The court granted plaintiffs' motion to strike all testimony about the Dex-O-Tex on the ground that the architect was not responsible for anything that happened under a subcontract let directly by the owner. The evidence regarding the stair treads was stricken "as not being within any issue *53 here." The evidence relating to the sagging floors was likewise stricken.
 The case was submitted to the jury on the issues framed in the complaint and answer thereto, and on only one issue raised by the cross-complaint, namely, whether the slope of the stairway landing was caused by the architect's negligent supervision and whether defendant sustained damage therefrom. The court refused to submit to the jury the claims for damages embodied in the first and second counts of the cross-complaint resulting from plaintiffs issuance of certificates of payment without obtaining releases. It also took from the jury the claim of damage in count four based on Krisel's issuance of a certificate of payment for $14,250.
 The initial problem posed is whether plaintiffs can enforce their claim for compensation for the architectural services rendered (1) under the medical building contract, and (2) in connection with the sales booths. [1] The manifest objective of the statutes regarding the architectural profession is to safeguard the public by penalizing an unlicensed person who engages in the unauthorized practice of architecture (Bus. & Prof. Code, 5536), and by preventing such a person from preparing plans, drawings, and specifications for others without informing them in writing that he is not an architect. (Bus. & Prof. Code, 5537; Payne v. DeVaughn, 77 Cal.App. 399, 403 [246 P. 1069]; W. M. Ballard Corp. v. Dougherty, 106 Cal.App.2d 35, 41 [234 P.2d 745].) Nonetheless, by statutory sanction, Palmer, as a licensed architect, was permitted to form a partnership for the conduct of business under the firm name with Krisel, an uncertified person. (Bus. & Prof. Code, 5539.) [fn. 4]
 In Joseph v. Drew, 36 Cal.2d 575 [225 P.2d 504], the court held, in construing section 5539 of the Business and Professions Code, that a partnership composed of licensed architects and an individual not so licensed may validly contract under the partnership name and collect for architectural services rendered so long as (1) those services were performed by the licensed members; and (2) the partnership met the following conditions expressly imposed by section 5539: (a) identifying on "all instruments of service" the members of *54 the firm who were architects, and (b) "in no case" designating "the other members ... as architects." (P. 580.) [2] Thus, while no obstacle is interposed to the association of a licensed architect and an uncertified person in a partnership for conducting a legitimate business, the policy is plainly articulated that the partnership entity may not be used as a facade behind which architectural services may be offered and furnished by unlicensed persons without compliance with the statutory requirements. [3] Hence, while such a partnership is not required to notify its clients in writing that a particular member is unlicensed (see Joseph v. Drew, supra), yet a client contracting with the partnership for architectural services has the right to expect those services will be performed by the licensed member, or at least under his responsible direction, [fn. 5] and that "in no case" will the other members of the partnership be designated as architects. (Bus. & Prof. Code, 5539.)
 An important question arises in this connection with respect to the evidence that a substantial part of the drawings, plans and specifications for the medical building and sales booths were prepared by Krisel, the unlicensed member, but checked by Palmer, the architect member. When such work is directed, supervised, checked and approved by a licensed firm member, it may well be considered as the product of the firm whose professional services a client has engaged. [4] So, where the work performed by an unlicensed member of the firm is done under the responsible direction and supervision of a licensed architect, the dual intent of the Legislature to protect the public from the injurious consequences of unskilled work yet at the same time to permit a partnership for the practice of architecture between an architect and an unlicensed person, may be regarded as served. (See Meyer & Holler v. Bowman, 121 Cal.App. 112, 116 [8 P.2d 936]; American Trust Co. v. Coryell, 3 Cal.2d 151, 154 [43 P.2d 1102].) [5] It is impossible to fix by any dogmatic judicial fiat the criteria which will inevitably determine whether the architectural services performed by the unlicensed member of such a partnership have been actually directed and supervised *55 by the architect member or whether such services have, in essence, been independently performed by the unlicensed person in circumvention of the statutory policy. This must be a question of fact upon consideration of the evidence peculiar to the particular case, with full opportunity permitted counsel to explore the attendant circumstances.
 Turning first to plaintiffs' performance under the medical building contract, we may for the moment forego consideration of any problems raised by the fact that Krisel prepared most of the plans and specifications while unlicensed and assume that they represented the final work of Palmer, the licensed architect who checked and approved them. [6] For in any event, it is clear that the express statutory command, that "in no case" shall the unlicensed member be designated as an architect, was violated when Krisel signed a certificate of payment in which he was designated as "Architect" while unlicensed. The statutory language prohibiting such designation is comprehensive, and it is patently calculated to prevent deception of the public at any stage of performance under a contract which the partnership entity was validly entitled to make without notifying its client that a particular member was not in fact an architect. Furthermore, under the terms of the contract, the issuance of certificates of payments was one of the "architect's services." Palmer admitted he did not direct Krisel to sign such certificate. It is argued that "Krisel, as a co-partner, had a right to sign such certificate on behalf of the co-partnership." But Krisel had no more right to issue such certificate authorizing payment when unlicensed than he had to designate himself as an architect, or to personally render architectural services not directed by Palmer. Nor is Krisel's action cured by the fortuitous fact that he was licensed the following day. A law student who has been notified that he has passed the bar examination but has not yet been admitted to practice may not, during such interim, designate himself as an attorney and transact business with a client as such. A candidate for an architectural license is in the same situation. The line of demarcation having been unequivocally drawn by the Legislature, we cannot by a process of judicial erosion impinge on that line by saying in effect that "in some cases" a nonlicensed member of a partnership may designate himself as an architect and render architectural services to one who has not been properly notified that he is not an architect.
 Plaintiffs argue that the repeated statements in Joseph v. *56 Drew, 36 Cal.2d 575 [225 P.2d 504], noting that the architectural services were actually provided by the licensed members of the partnership, "are not necessary to the decision and must, therefore, be considered as dicta." We cannot agree. Section 5539, as construed in Joseph v. Drew, does not purport to provide a convenient shelter behind which an unlicensed person may engage in the unrestricted practice of architecture with impunity. [7] It merely permits an architect to unite his technical skill with the business talent, financial means or special proficiency of some unlicensed person, and permits the partnership entity to transact business as such with its clients, under designated restrictions. But the architectural services rendered must be those of the licensed member, or at least, work of his staff which he has effectively directed, supervised, and adopted as his own.
 [8] It necessarily follows that although the partnership contract for the rendition of architectural services was valid in its inception, plaintiffs' right to recover thereunder is defeated by the manner in which performance was executed. (Joseph v. Drew, supra.) The contract for the medical building being indivisible, plaintiffs should not be entitled to retain the money advanced to them on account by defendant. Defendant, however, could not recover these payments under his third cause of action in his cross-complaint since it was predicated upon the theory that plaintiffs had violated section 5537, Business and Professions Code, which was not here applicable. (Joseph v. Drew, supra.) He should, nevertheless, have the opportunity to amend this cause of action so as to seek recovery of such payments on the theory that an unlicensed member of the firm performed architectural services, not directed or supervised by the architect, and also improperly designated himself as an architect in violation of section 5539, Business and Professions Code.
 What we have previously remarked is especially pertinent to the question of whether plaintiffs are entitled to compensation for designing the sales booths. Most of these plans, like the others, were designed by Krisel and purportedly checked by Palmer. [9] Counsel for defendant endeavored early in the trial to inquire searchingly into the matter of whether Krisel or Palmer was actually doing the work called for under the contract, and to this end sought to examine Palmer as to what portion of the architectural services were performed by him and what portion by Krisel. Counsel was precluded from pursuing this significant line of inquiry when the court sustained *57 an objection thereto on the ground that "the partnership is the plaintiff and these services were performed by the partnership, and it makes no difference which one of the partners performed the services." The trial court fell into the fundamental error of accepting the thesis that since the partnership could validly make the contract here involved, it was immaterial which of the partners and under what circumstances, performed the services. Defendant was thus choked off in his effort to establish the full extent of the role played by the nonlicensed member in the rendition of the additional services in the design of the sales booths. Upon a retrial of this issue, counsel should be permitted the latitude necessary to ascertain these facts.
 Plaintiffs also sought recovery of $510 as the reasonable value of "extra work" performed after the default of the contractors. These services were rendered after Krisel was licensed. Defendant testified that plaintiffs agreed to make no charge for these services. Plaintiffs testified to the contrary. Since it cannot be ascertained from the judgment whether the jury found in favor of plaintiffs or defendant on this item, this issue must also be retried.
 The next major contention of defendant is that the court improperly withdrew from the jury consideration of his claim for damages resulting from the issuance of certificates of payment, amounting to $46,600, without first obtaining lien releases. The first and second counts were based on fraud and negligence, respectively, and the fourth related specifically to the issuance of the certificate by Krisel for $14,250 on October 27, 1950, before the time called for by the contract and on which he designated himself as "architect" while unlicensed.
 The record shows that in supervising the erection of another building by King and Riking for defendant immediately prior to the present job, plaintiffs had in almost every instance obtained lien releases from King prior to issuing a certificate to him. They failed to ask for them on the present job at any time, although they could have done so under defendant's contract with King-Riking. The evidence showed that during the progress of the medical building work, plaintiffs accepted private employment from King and Riking and received payments therefor. Defendant testified that he never requested any of the certificates to be issued, but relied on plaintiffs to issue them at the proper time. Plaintiffs, on the contrary, asserted that defendant often telephoned and asked that a certificate of payment be issued. *58
 [10a] With respect to counts one and two of the cross-complaint, the court advised the jury, in part, as follows: "I am not submitting to you any issue as to damages because of the issuance of these progress payment certificates. While it ordinarily would be a question of fact for you to determine whether or not the architect did use the care he was required to use in superintending the work and issuing those certificates, ... under the evidence submitted here, even if you should determine that he should have made those inquiries and secured lien releases, there is nothing on which you could base damages, because no proof was offered at all that at the time those certificates were issued there was one cent due to any contractor for any labor or material. The only proof offered was that a month after the last one was issued there was thirteen thousand and some dollars due ..." (Emphasis added.)
 In support of the court's action, plaintiffs point to the fact that Rottger, the contractor's bookkeeper, was unable to testify specifically as to "what materials theretofore delivered and incorporated in the job, or labor, was not paid for" at the time each respective certificate of payment was issued. Because of this they assert the court was required to hold that defendant was unable to establish any damage and to withdraw such issue from the jury. However, Rottger did testify that on October 27, 1950, all of Riking's accounts payable were due, and that up to November 30, 1950, only $27,391.33 of the bills chargeable to the medical building had been paid by the contractors, as against $46,600 received by the contractors upon certificates of payment during that period. It is thus inescapable that at the time the progress payment certificates were issued, attesting that King and Riking were entitled to intermediate payments for the building material, the contractors had not been paying all of their subcontractors. The court's charge is based on the fundamental misconception that if there was no showing that any particular bill for material or labor was due a subcontractor when the certificate was issued, defendant could not prove he was damaged by the issuance of the certificate. However, though a bill for such labor and material might not be due in the technical sense of being then payable, it was nonetheless owing if it had been furnished by the subcontractor for the building, though payments, as between subcontractor and contractor, might be deferred. (See Gelgud v. Los Angeles Rock & Gravel Co., 14 Cal.App.2d 604, 608 [58 P.2d 673]; Crocker-Woolworth Nat. *59 Bank v. Carle, 133 Cal. 409, 411 [65 P. 951].) This illustrates why a lien release would have protected defendant against the very evils which later beset him. [11] The architect's certificate as a precondition of payment was for the benefit of defendant (Marshall v. Vallejo Commercial Bank, 163 Cal. 469, 475 [126 P. 146]), and one of its purposes might well be to assure him that payments of the sums specified therein would discharge him and his property for the labor and materials for which he was paying. [10b] This could have been accomplished by the architect's demanding from the contractors evidence of payment for labor and material or insisting on lien releases from the suppliers thereof. If such a duty was cast upon plaintiffs (and in its charge the court concedes that the jury might have so found), the jury might also have found that had plaintiffs properly discharged this duty, the discrepancy between what the contractors received and what they paid out might have been obviated, or, in any event, that defendant would have been protected by the lien releases. There was thus ample evidence on which the jury might have based a determination that defendant was substantially damaged by plaintiffs' negligent failure to require receipts or lien releases from the contractors.
 So far as the fraud count is concerned, it must be remembered that there was evidence that plaintiffs had accepted work and received payments therefor from the contractors at the very time they were supervising the same contractors' work for defendant. [12] An architect owes to his client a fiduciary duty of loyalty and good faith (Barron Estate Co. v. Woodruff Co., 163 Cal. 561, 575 [126 P. 351, 42 L.R.A.N.S. 125].) [13] As a trusted agent of the owner, and to avoid conflict of loyalties, he should not "at the same time be employed by the owner and the builder and receive pay from both, except with the knowledge and consent of the owner." (6 C.J.S., Architects, p. 316. And see Corey v. Eastman, 166 Mass. 279 [44 N.E. 217, 55 Am.St.Rep. 401].) It was thus error to withdraw these issues of fact from the jury.
 [14] It was likewise improper for the court to withdraw from the jury the charges in defendant's fourth cause of action relating to the issuance by Krisel of a certificate of payment of $14,250 on October 27, 1950, with the notation thereon that it was "For plastering at end of brown coat." [fn. 6] The considerations *60 reflecting damage to defendant which we have previously discussed apply with equal pertinence in this connection. Other factors may be mentioned, exclusive of the fact that it bore Krisel's signature as "Architect" while he was yet unlicensed. The certificate read in part that the contractor "is entitled to a 25% payment of Fourteen Thousand and Two Hundred Fifty and 00/100 Dollars, by the terms of the contract." (Emphasis added.) The contract called for a 25 per cent payment "when plaster is approved by L.A. City and architect." The record shows that the plastering was not approved by the city inspector until January 22, 1951. Even Krisel's testimony of his alleged telephone conversation with defendant is that the defendant called him to say that King needed some money "and could he please get a payment on the plaster if we had inspected it and if it had been approved." (Emphasis added.) Despite the fact that there had been no city approval, since the plastering was not even finished, Krisel nevertheless issued the certificate authorizing the payment as pursuant "to the terms of the contract." There is no testimony that defendant intended to authorize a payment before the approval under the contract had been obtained. The notation "at end of brown coat," which defendant testified he did not see, did not, as a matter of law, constitute a waiver by him of the terms of the contract or ratify the premature issuance of the certificate. "A motion for a directed verdict like a motion for a nonsuit is in the nature of a demurrer to the evidence, and concedes as true the evidence on behalf of the adverse party with all fair and reasonable inferences to be deduced therefrom." (Lehmann v. Mitchell, 109 Cal.App.2d 719, 723-724 [241 P.2d 573].) Defendant argues correctly that by refusing to submit the fourth count to the jury, the court arrogated to itself the jury's function by giving conclusive effect to Krisel's testimony that he issued the $14,250 certificate pursuant to defendant's telephonic request, though such testimony was somewhat equivocal, squarely contradicted by defendant, and susceptible to being discredited by the showing that plaintiffs were receiving *61 compensation for architectural services from the contractors at the very time they were supervising the latter's performance on the medical building.
 The court refused also to submit to the jury the question whether plaintiffs properly performed their supervisory duties with respect to such defects as off-level floors, the rotting of stair treads, and the cracked Dex-O-Tex matting. This was error. [15] An architect, when supervision is a part of the duties assumed by him under his contract with the owner, is required to exercise due care in the performance of his supervisory function, and is liable to the owner for negligence on his part. (Lindeberg v. Hodgens, 89 Misc. 454 [152 N.Y.S. 229, 231]; Avent v. Proffitt, 109 S.C. 48 [95 S.E. 134, 135]; Pierson v. Tyndall, (Tex.Civ.App.) 28 S.W. 232.) Plaintiffs undertook the duty of supervision of the work. They agreed to continue to supervise the work after the contractors' default, and indeed, claimed $510 extra compensation therefor. Palmer testified that considerably more time was devoted to supervision after such default. However, when it appeared that the Dex-O-Tex contract was let by defendant after the default, the court stated it would admit no "evidence as to what took place after the default and after the owner had taken it over." This ruling was clearly wrong, in view of Palmer's testimony, as well as testimony that the cracking of the Dex-O-Tex resulted from lack of sufficient rigidity in the underlying steel structure and not from any defect in the material. The fact that defendant, instead of King, let the contract did not lessen plaintiffs' responsibility to supervise the work in accordance with their agreement.
 [16, 17] The record also shows that the steps were formed of laminated wood glued on the job and covered with steel plates. Palmer gave assurance that the glue used was waterproof and would cause no difficulty. The steps subsequently rotted and fell apart. It was also discovered six months after the building was completed that the floors in the offices on the second floor sagged. There was testimony that this was due to defective construction in the underlying steel framework. While concededly the architect's undertaking, absent a special agreement, is not an absolute guaranty that satisfactory results will ensue (see White v. Pallay, 119 Ore. 97 [247 P. 316]; Shipman v. State, 43 Wis. 381; Chapel v. Clark, 117 Mich. 638 [76 N.W. 62, 72 Am.St.Rep. 587]), there is evidence that the above defects might have been caused not *62 merely by deficiencies in the materials used, but by plaintiffs' failure to exercise reasonable care and diligence in the supervision of the work. Under the circumstances here present, these were issues of fact which should have gone to the jury. (See Trunk & Gordon v. Clark, 163 Iowa 620 [145 N.W. 277, 279]; Kortz v. Kimberlin, 158 Ky. 566 [165 S.W. 654, 655].)
 Lastly, defendant assigns as error the court's refusal to give his three requested instructions. The first two relate primarily to issues which the court improperly withdrew from the jury, and require no discussion here. [18] The third instruction was to the effect that any concurrent negligence of the contractor, contributing to the damage of defendant, would not relieve plaintiffs of their own negligence. [fn. 7] This was a proper statement of the law of negligence applicable to architects (Alexander v. Hammarberg, 103 Cal.App.2d 872, 884 [230 P.2d 399]; Schwartz v. Kuhn, 71 Misc. 149 [126 N.Y.S. 568, 570]; Pierson v. Tyndall, (Tex.Civ.App.) 28 S.W. 232) and defendant was entitled to have the instruction presented to the jury. (Alexander v. Hammarberg, supra.) It was within the issues, not remotely covered by any other instruction, and was of extreme importance in the jury's consideration of the question of plaintiffs' liability for negligent supervision with respect to the single defect in construction submitted to the jury--that of the stairway landing. A failure to give an instruction of similar import was held to be reversible error in Pierson v. Tyndall, supra. Defendant was similarly prejudiced by the court's refusal to give this instruction since otherwise the jury might have concluded such defect was chargeable to the contractors' negligence alone. In the circumstances, the jury should have been advised of the legal effect of concurrent negligence.
 The judgment is reversed with directions: (a) to permit defendant, if so advised, to amend the third cause of action *63 in his cross- complaint; (b) to retry the issues raised by the cross-complaint as amended and the answer thereto; and (c) to retry only the issues in plaintiffs' complaint which relate to their claim to compensation for the "extra" and "additional" services alleged therein.
 Moore, P. J., and McComb, J., concurred.
NOTES
[fn. 1] 1. [Tabular Material Omitted]
[fn. 2] 2. Article 22 gave the owner the right to terminate the contract upon certificate of the architect that sufficient cause existed to justify such action, specifying among other causes failure of the contractor to make prompt payment to subcontractors or for material or labor.
[fn. 3] 3. The application for a building permit was signed by Dan Saxon Palmer, Architect, alone. Palmer's state license number was set forth in the body of the application.
[fn. 4] 4. Section 5539 reads: "This chapter does not prevent an architect from forming a partnership with persons who are not architects but the name of the architect shall appear as the architect on all instruments of service, and in no case may the other members of the partnership be designated as architects."
[fn. 5] 5. Section 5586 reads: "The fact that the holder of a certificate has affixed his signature to plans, drawings, specifications or other instruments of service which have not been prepared by him or in his office, or under his immediate and responsible direction, or has permitted his name to be used for the purpose of assisting any person, not an architect, to evade the provisions of this chapter, constitutes a ground for disciplinary action."
[fn. 6] 6. The court stated: "As to the fourth cause of action, that they issued the payment of some fourteen thousand dollars to the contractors, and that it was prematurely issued, I cannot see any evidence of that. But if it was, the evidence shows that it was issued at the time the brown coat was on, and if the contract provided that it was to be issued only after the finish coat was put on the owner knew of that provision, and he knew of the issuance of the payment order, so therefore there could be no breach of the contract. Therefore, I am not submitting that issue to you. He could not be damaged in the sum of $14,250, or in any other amount, unless there was something unpaid at that time, because there is no doubt but that he got the finish coat anyway."
[fn. 7] 7. "When the negligent acts or omissions of two or more persons, whether committed independently or in the course of jointly directed conduct, contribute concurrently and as proximate causes to the injury of another, each of such persons is liable, regardless of the relative degree of the contribution. It is no defense for any of such persons that some other person, not joined as a defendant in the action, participated in causing the injury, even if it should appear to you that the negligence of that other person was greater in its wrongful nature or effect. Thus, in the present case, if you find from the evidence and under the instructions of the court that the alleged negligent acts or omissions of the cross-defendants contributed proximately to the injury of the cross-complainant, it is immaterial that the negligent acts or omissions of the contractor, who is not joined as a defendant in this action, may also have contributed to such injury."