**CITY OF MOUNDS VIEW, Appellant,**

v.

**Kenneth H. WALIJARVI, Individually and d. b. a. Kenneth H. Walijarvi & Associates, Architects, defendants and third party plaintiffs, Respondents.**

**B–E ENTERPRISES, INC., Defendant,**

v.

**Linus J. MEISCH and Gausman and Moore, Inc., Third Party Defendants.**

**Nos. 47358 and 47422.**

Supreme Court of Minnesota.

Feb. 17, 1978.

Richard Meyers and Sharon L. W. Rushton, St. Paul, for appellant.

Leonard, Street & Deinard and Lowell J. Noteboom and M. Patricia Schaffer, Minneapolis, for respondents.

Heard before KELLY, TODD and SCOTT, JJ., and considered and decided by the court en banc.

TODD, Justice.

The city of Mounds View retained Kenneth H. Walijarvi, an architect, and his firm to design an addition to the city hall. Plans were prepared, and after construction commenced, the city expressed concern over possible water seepage into the basement of the new structure. Despite the architects' assurance to the contrary, serious moisture problems were encountered. The city sued the architects, among others, alleging negligence and the breach of both express and implied warranties. The trial court granted partial summary judgment in favor of the architects on the warranty issues,[1] and the city appeals from the judgment. We affirm.

In September 1973, Walijarvi and his firm were retained to design and provide other architectural services in connection with the construction of an addition to the Mounds View city hall. The parties executed a standard form agreement between owner and architect which had been prepared by the American Institute of Architects. Article 12 of that agreement provided in part:

"* * * This agreement may be amended only by written instrument signed by both Owner and Architect."

Following the approval of Walijarvi's design for the new addition, the general construction contract was awarded to B–E Enterprises, Inc., another defendant in this litigation.

At some point after substantial progress had been made on the construction of the addition, the city became concerned about excessive dampness being experienced in the basement of the new construction. The city's concern was expressed in a letter written by the city administrator to the architectural firm. This letter was never introduced into evidence and its exact terms are thus unavailable. Walijarvi responded on March 20, 1975 with the following letter:

"Mr. Mark Achen,
CITY ADMINISTRATOR
CITY OF MOUNDS VIEW
2401 Highway 10
Mounds View, Minnesota 55112

"RE: MOUNDS VIEW MUNICIPAL BUILDING ADDITION & ALTERATIONS

"Dear Mark:

"This is in response to your letter of March 3, 1975, as per the request of the Council.

"We, as architects and engineers for the above project, hereby guarantee that our design of the lower level is such that, in our opinion, the lower level shall remain water-tight and damp-free.

---

1. The issue of negligence remains for trial.

"At the same time that we say this, I must add two precautions. Most of us have basements in our homes. Most of us do not air-condition our homes. Traditionally, during the hot, humid summer months of July and August, our basements are generally damp to the extent that many of us purchase dehumidifiers and run these constantly during the summer months. This is not at all uncommon.

[Explanation of the phenomenon omitted.]

"The other situation I wish to call to your attention is that, simply, the responsibility of the watertightness and the damp-free aspect of the lower level is not singularly our responsibility. We have designed it to be so, but because we have not constructed the building, but only designed it and inspected the construction as such as has progressed, we, in no way, can guarantee that it was built in accordance with our design specifications.

"To our knowledge, B–E Enterprises has done this, and we find no cause to believe that they have done differently.

"However, *if the Council is apprehensive, we shall hereby, with a copy of this letter to B–E Enterprises, request that they, likewise, guarantee the watertightness and dampproofness of the basement*, not from a design point-of-view, but from a construction point-of-view, indicating that to the best of their knowledge, they have complied with the specifications and drawings to achieve such watertightness and dampproofness.

"I would like to close simply by saying that it is our intent to provide a complete full service to the Mayor, the Council, the Administration and the people of Mounds View, in a professional and a sincerely honest manner *to guarantee them not only the watertightness of the basement, but to guarantee against structural failure, collapse under ordinary weather conditions, etc.* Our contract so indicates this. Our license as architects in the State of Minnesota and Wisconsin also indicates this. We wish to establish a good rapport with the Mayor, the Coun-

cil, the Administration and the people of Mounds View of such high quality that there is no hesitancy or question on the part of the above as to our integrity and intent. We shall make every attempt to serve the City of Mounds View to your complete satisfaction.

"Sincerely,

"KENNETH H. WALIJARVI & ASSOCIATES, ARCHITECTS

/s/ KENNETH H. WALIJARVI, A.I.A.
Architect" (Italics supplied.)

Sometime later, serious water seepage did in fact develop in the new addition, necessitating extensive and costly remedial measures. The city brought this action in an effort to recover the damages it suffered as a consequence of the water problems. The city alleged that the architects' plans were negligently prepared, that the architects' letter amended the original written agreement with the city by inserting an express warranty, and that the failure of the architects' design to produce a watertight basement constituted a breach of both the express warranty and an implied warranty of fitness for a particular purpose.

The architects moved for partial summary judgment on the issue of the breach of express and implied warranties, and the motion was granted. In the memorandum accompanying its order, the trial court stated that the letter from the architects appeared to be an expression of opinion and did not constitute an express warranty. The court also held that absent express language of warranty, a contract for the provision of architectural services does not impliedly guarantee a perfect plan or an entirely satisfactory result.

The issues presented on appeal are:

(1) Did the architects' letter amend the parties' original agreement by inserting a new term expressly warranting that the basement of the new structure would be watertight?

(2) Was the interpretation of the architects' letter a proper matter for resolution on a motion for summary judgment?

(3) Does an architect's agreement to design a structure include an implied warranty that the finished product will be fit for the purpose for which it was designed?

■ 1. The city seeks to construe the exchange of letters which occurred in March 1975 as a modification of the original agreement between the parties. As quoted above, however, that agreement provided in unambiguous terms that it was to be amended only by a written instrument signed by both parties. In an effort to escape the literal application of this language, the city argues that it would be appropriate for us to effectively fuse the two letters into a single document, thereby qualifying it as an amendment within the terms of the original agreement.

It must be observed, however, that the initial letter written by the city administrator is not in evidence and we are completely uninformed as to its contents. If, in fact, the administrator's letter had been written for the purpose of soliciting an express warranty, and if the architects had responded favorably, the city's position might be of some merit. See, 4 Williston, Contracts (3 ed.) § 582. However, we do not consider that possibility because we think it is plainly inappropriate for this court to find a portion of an express warranty contained in a document which we have never seen. Accordingly, we conclude that there was no express warranty created as to the watertight characteristics of the new construction.

2. Having disposed of the express warranty issue as stated above, we need not consider whether the architects' letter itself could fairly be construed as containing the language of an express warranty. The trial court was therefore correct in granting partial summary judgment on the express warranty question.

■ 3. As an alternative basis for recovering damages from the architects, the city urges that we adopt a rule of implied warranty of fitness when architectural services are provided. Under this rule, as articulated in the city's brief, an architect who contracts to design a building of any sort is deemed to impliedly warrant that the structure which is completed in accordance with his plans will be fit for its intended purpose.

As the city candidly observes, the theory of liability which it proposes is clearly contrary to the prevailing rule in a solid majority of jurisdictions. The majority position limits the liability of architects and others rendering "professional" services to those situations in which the professional is negligent in the provision of his or her services. With respect to architects, the rule was stated as early as 1896 by the Supreme Court of Maine (*Coombs v. Beede,* 89 Me. 187, 188, 36 A. 104 [1896]):

"In an examination of the merits of the controversy between these parties, we must bear in mind that the [architect] was not a contractor who had entered into an agreement to construct a house for the [owner], but was merely an agent of the [owner] to assist him in building one. The responsibility resting on an architect is essentially the same as that which rests upon the lawyer to his client, or upon the physician to his patient, or which rests upon anyone to another where such person pretends to possess some skill and ability in some special employment, and offers his services to the public on account of his fitness to act in the line of business for which he may be employed. The undertaking of an architect implies that he possesses skill and ability, including taste, sufficient to enable him to perform the required services at least ordinarily and reasonably well; and that he will exercise and apply in the given case his skill and ability, his judgment and taste, reasonably and without neglect. But the undertaking does not imply or warrant a satisfactory result." [2]

---

**2.** Accord: *Gravley v. Providence Partnership,* 549 F.2d 958 (4 Cir. 1977); *Ryan v. Morgan Spear Assn. Inc.,* 546 S.W.2d 678 (Tex.Civ.App. 1977); *Borman's Inc. v. Lake State Development Co.,* 60 Mich.App. 175, 230 N.W.2d 363 (1975); *Sears, Roebuck & Co. v. Enco Associates,* 83 Misc.2d 552, 370 N.Y.S.2d 338 (Sup.Ct. 1975), affirmed, 54 A.D.2d 13, 385 N.Y.S.2d 613

The reasoning underlying the general rule as it applies both to architects and other vendors of professional services is relatively straightforward. Architects, doctors, engineers, attorneys, and others deal in somewhat inexact sciences and are continually called upon to exercise their skilled judgment in order to anticipate and provide for random factors which are incapable of precise measurement. The indeterminate nature of these factors makes it impossible for professional service people to gauge them with complete accuracy in every instance. Thus, doctors cannot promise that every operation will be successful; a lawyer can never be certain that a contract he drafts is without latent ambiguity; and an architect cannot be certain that a structural design will interact with natural forces as anticipated. Because of the inescapable possibility of error which inheres in these services, the law has traditionally required, not perfect results, but rather the exercise of that skill and judgment which can be reasonably expected from similarly situated professionals. As we stated in *City of Eveleth v. Ruble*, 302 Minn. 249, 253, 225 N.W.2d 521, 524 (1974):

> "One who undertakes to render professional services is under a duty to the person for whom the service is to be performed to exercise such care, skill, and diligence as men in that profession ordinarily exercise under like circumstances."[3]

See, also, *Kostohryz v. McGuire*, 298 Minn. 513, 212 N.W.2d 850 (1973).

We have reexamined our case law on the subject of professional services and are not persuaded that the time has yet arrived for the abrogation of the traditional rule. Adoption of the city's implied warranty theory would in effect impose strict liability on architects for latent defects in the structures they design. That is, once a court or jury has made the threshold finding that a structure was somehow unfit for its intended purpose, liability would be imposed on the responsible architect in spite of his diligent application of state-of-the-art design techniques. If every facet of structural design consisted of little more than the mechanical application of immutable physical principles, we could accept the rule of strict liability which the city proposes. But even in the present state of relative technological enlightenment, the keenest engineering minds can err in their most searching assessment of the natural factors which determine whether structural components will adequately serve their intended purpose. Until the random element is eliminated in the application of architectural sciences, we think it fairer than the purchaser of the architect's services bear the risk of such unforeseeable difficulties.[4]

The city suggests that many of the design-related tasks performed by modern architects are routine and carry no risk of error if they are performed with professional due care. It is argued that with respect to such tasks, the premise on which the traditional rule rests is inoperative, making the adoption of the implied warranty theory fully proper. We note, however, that archi-

(1976); *Mississippi Meadows, Inc. v. Hodson*, 13 Ill.App.3d 24, 299 N.E.2d 359 (1973); *Scott v. Potomac Insurance Co. of Dist. of Columbia*, 217 Or. 323, 341 P.2d 1083 (1959); *Smith v. Goff*, 325 P.2d 1061 (Okl.1958); *Ressler v. Nielsen*, 76 N.W.2d 157 (N.D.1956); *Palmer v. Brown*, 127 Cal.App.2d 44, 273 P.2d 306 (1954).

**3.** A collection of the authorities on this point appears in note 2 of our decision in *City of Eveleth v. Ruble*, 302 Minn. 249, 253, 225 N.W.2d 521, 524 (1974).

**4.** Our decision in *Robertson Lumber Co. v. Stephen Farmers Co-op. Elev. Co.*, 274 Minn. 17, 143 N.W.2d 622 (1966), does not compel a different result. In that case, we affirmed an award of damages for a defectively constructed grain storage building on a theory of implied warranty. The contract in question, however, was treated as a construction contract and not an architectural contract. This distinction for warranty purposes between "professional" services and general contracting services is well established in other jurisdictions. See, e. g., *Kriegler v. Eichler Homes, Inc.*, 269 Cal. App.2d 224, 74 Cal.Rptr. 749 (1969); *Stuart v. Crestview Mutual Water Co.*, 34 Cal.App.3d 802, 110 Cal.Rptr. 543 (1973); *Schipper v. Levitt & Sons, Inc.*, 44 N.J. 70, 207 A.2d 314 (1965); *Weeks v. Slavick Builders, Inc.*, 24 Mich.App. 621, 180 N.W.2d 503, affirmed, 384 Mich. 257, 181 N.W.2d 271 (1970).

tectural errors in relatively simple matters are quite easily handled under the existing cause of action for professional negligence.

Moreover, if implied warranties are held to accompany only uncomplicated architectural endeavors, the finder of fact will be forced in every case to determine, as a preliminary matter, whether the alleged architectural error was made in the performance of a sufficiently simplistic task. Defects which are found to be more esoteric would presumably continue to be tried under the traditional rule. It seems apparent, however, that the making of any such threshold determination would require the taking of expert testimony and necessitate an inquiry strikingly similar to that which is presently made under the prevailing negligence standard. We think the net effect would be the interjection of substantive ambiguity into the law of professional malpractice without a favorable trade-off in procedural expedience.

In addition, we observe that the ills which spurred the creation and expansion of the implied warranty/strict liability doctrine are not really present in this case or in the architect-client relationship generally. The implied warranty of fitness originated primarily as a means of facilitating the legitimate interests of the consuming public and bringing common-law remedies into step with the practicalities of modern industrialism. The outmoded requirement of contractual privity, coupled with manufacturers' sweeping disclaimers of liability, frequently operated to deny effective remedies to those who purchased commercial products at the bottom of a multi-tiered production and distribution network. See, generally, Prosser, Torts (4 ed.) §§ 97, 98. The introduction of the implied warranty doctrine created an effective remedy by allowing plaintiffs to proceed directly against the offending party without reliance on express contractual warranties.

The relationship between architect and client is markedly different. For a client, architectural services are hardly produced by a faceless business entity, insulated by a network of distributors, wholesalers, and retailers. Architects and clients normally enjoy a one-to-one relationship and communicate fairly extensively during the course of the relationship. When a legal dispute arises, the client has no trouble locating the source of his problem, and a remedial device like the implied warranty is largely unnecessary.

Finally, while it is undoubtedly fair to impose strict liability on manufacturers who have ample opportunity to test their products for defects before marketing them, the same cannot be said of architects. Normally, an architect has but a single chance to create a design for a client which will produce a defect-free structure. Accordingly, we do not think it just that architects should be forced to bear the same burden of liability for their products as that which has been imposed on manufacturers generally.

For these reasons, we decline to extend the implied warranty/strict liability doctrine to cover vendors of professional services. Our conclusion does not, of course, preclude the city from pursuing its standard malpractice action against the architects and proving that the basement area of the new addition was negligently designed. That issue remains for the trier of fact in the district court.

Affirmed.

OTIS, J., took no part in the consideration or decision of this case.