2001 UT 54

**SME INDUSTRIES, INC., a Utah corporation, Plaintiff and Appellant,**

v.

**THOMPSON, VENTULETT, STAINBACK AND ASSOCIATES, INC.; Robert Norman Veale; Gillies, Stransky, Brems & Smith; Jonathan Bradshaw; Reaveley Engineers & Associates, Inc., a corporation; Earl S. Eppich; and Does 1–40 inclusive, Defendants and Appellees.**

No. 990869.

Supreme Court of Utah.

June 26, 2001.

Rehearing Denied July 26, 2001.

Harold C. Verhaaren, D. Scott Crook, Salt Lake City, for plaintiff.

John N. Braithwaite, Salt Lake City, for TVSA defendants.

Craig R. Mariger, Edward R. Munson, Salt Lake City, for GSBS defendants.

Craig C. Coburn, Bastiaan K. Coebergh, Salt Lake City, for Reaveley defendants.

RUSSON, Associate Chief Justice:

¶ 1 Plaintiff SME Industries, Inc., brought this action against numerous defendants, seeking delay damages and other economic losses it allegedly incurred while working on a construction project. The trial court granted defendants' motions for summary judgment, and SME appeals.

## BACKGROUND

¶ 2 On May 20, 1992, Salt Lake County (the "County") entered into a contract for architectural and consulting services with Thompson, Ventulett, Stainback and Associates, Inc., and Robert Norman Veale [1] (collectively, "TVSA"). Pursuant to TVSA's contract with the County (the "County–TVSA contract"), TVSA agreed to provide, inter alia, "designs, drawings, and specifications" for a construction project to renovate and expand the Salt Palace Convention Center in Salt Lake City, Utah (the "project"). The County–TVSA contract also provided that TVSA would be assisted by other design professionals approved by the County (the

"design team") in performing its responsibilities under the contract. Accordingly, TVSA contracted with Gillies, Stransky, Brems & Smith and Jonathan Bradshaw [2] (collectively, "GSBS") to provide local architectural services for the project (the "TVSA–GSBS contract"),[3] and Reaveley Engineers & Associates, Inc., and Earl S. Eppich [4] (collectively, "Reaveley") to provide structural engineering services for the project (the "TVSA–Reaveley contract"). Neither GSBS nor Reaveley contracted directly with the County.

¶ 3 In early 1994, the County advertised the construction of the project for bids. Hughes–Hunt, a joint venture, submitted a bid to the County to become the general contractor and, in furtherance of that purpose, received a bid from SME Industries, Inc. ("SME"), to furnish, fabricate, and erect the structural steel for the project. Hughes–Hunt was awarded the contract and subsequently entered into a subcontract agreement with SME. Neither SME nor Hughes–Hunt contracted directly with any member of the design team.

¶ 4 Shortly after beginning work on the project, SME encountered problems with the structural steel portions of the plans and specifications prepared by the design team. These problems continued over the course of SME's work on the project and necessitated the preparation and submittal of more than 450 requests for information ("RFIs"). Moreover, the problems with the structural steel portion of the project also necessitated the submittal of numerous requests for change orders for clarifications of the plans and specifications.

¶ 5 Accordingly, after the project was completed, SME submitted to Hughes–Hunt a request for recovery of extraordinary costs in the amount of $2,193,000. SME claimed it was entitled to recover the extraordinary costs because the design team's responses to its RFIs and change orders were consistently

---

1. Robert Norman Veale was an architect employed by Thompson, Ventulett, Stainback and Associates.

2. Jonathan Bradshaw was an architect employed by Gillies, Stransky, Brems & Smith.

3. Due to its objections over certain terms of the TVSA–GSBS contract, GSBS never signed the contract.

4. Earl S. Eppich was a professional engineer employed by Reaveley Engineers & Associates.

late, were internally inconsistent, conflicted with the plans and specifications, and often failed to address the issues raised by SME. As a result, SME alleged that its fabrication and erection of structural steel for the project were substantially disrupted and its schedules for fabrication and erection of steel on other unrelated projects were also adversely affected.

¶ 6 After receiving SME's claim, Hughes–Hunt forwarded it to the County. At the County's request, the design team reviewed the claim and submitted a written statement recommending that the County reject it, which the County did. Nevertheless, the County reached a settlement with Hughes–Hunt. The settlement included payment to Hughes–Hunt of $150,000 and the assignment of all rights, causes of action, and claims the County had against the design team related to the structural steel portion of the project. Thereafter, Hughes–Hunt reached a settlement with SME, paying SME the $150,000 and assigning SME all of its direct and assigned rights, causes of action, and claims against the design team.

¶ 7 On April 24, 1998, SME filed a complaint in the district court against TVSA, GSBS, and Reaveley, seeking delay damages and other economic losses it allegedly sustained as a result of its work on the project.[5] SME's lawsuit asserted its direct claims against TVSA, GSBS, and Reaveley, as well as the assigned claims that the County and/or Hughes–Hunt had against defendants. Specifically, SME sought recovery under a total of five legal theories: (1) breach of the County–TVSA contract; (2) breach of express and implied warranties allegedly contained in the County–TVSA contract; (3) negligent interference with advantageous economic interests against TVSA; (4) professional negligence against TVSA, GSBS, and Reaveley; and (5) breach of third-party beneficiary claims arising out of the County–TVSA, TVSA–GSBS, and TVSA–Reaveley contracts.

¶ 8 None of defendants answered SME's complaint. Instead, TVSA, GSBS, and Reaveley each filed separate motions to dismiss, which the trial court treated as motions for summary judgment. At the conclusion of oral argument held April 9, 1999, the trial court granted each of defendants' motions, dismissing SME's claims against all defendants as a matter of law. An order to that effect was entered on September 21, 1999. In its order, the trial court concluded that (1) SME's County-assigned breach of contract claims against TVSA failed because the County–TVSA contract prohibited the assignment of the County's "interest in [the] Agreement" and, as a matter of law, such language prohibited not only the assignment of the performance of the contract, but also the assignment of a cause of action arising out of a breach of the contract; (2) TVSA made no express warranties regarding its plans and specifications for the project; (3) the implied warranty claim against TVSA failed because design professionals cannot be liable under a theory of implied warranty as a matter of law; (4) the economic loss rule barred SME's direct and assigned negligence claims against all members of the design team; and (5) the respective contracts did not evidence an intent on the part of the contracting parties to confer a separate and distinct benefit upon SME, the County, or Hughes–Hunt and that, therefore, SME's direct and assigned third-party beneficiary claims failed as a matter of law. SME appeals each of the trial court's determinations.

## STANDARD OF REVIEW

¶ 9 Our standard of review when considering challenges to a summary judgment is well settled. Summary judgment is appropriate only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Utah R. Civ. P. 56(c); *Franco v. Church of Jesus Christ of Latter-day Saints*, 2001 UT 25, ¶ 32, 21 P.3d 198. In determining whether the trial court correctly found that there was no genuine issue of material fact, "we accept the facts and inferences in the light most favorable to the [nonmoving] party." *Winegar v. Froerer Corp.*, 813 P.2d 104, 107 (Utah 1991). In deciding whether the trial court correctly granted judgment as

---

**5.** SME filed an amended complaint on September 3, 1998, asserting the same claims.

a matter of law, "we give no deference to the trial court's view of the law; we review it for correctness." *Ron Case Roofing & Asphalt Paving, Inc. v. Blomquist*, 773 P.2d 1382, 1385 (Utah 1989).

## ANALYSIS

### I. SME'S BREACH OF CONTRACT CLAIM AGAINST TVSA

¶ 10 SME's first claim for relief is based upon an alleged breach of the County–TVSA contract. SME was not a party to the County–TVSA contract and therefore is pursuing its breach of contract claim under a purported assignment by the County of its rights, causes of action, and claims against TVSA to Hughes–Hunt, and Hughes–Hunt's subsequent assignment of such interests to SME. In dismissing the claim, the trial court ruled that SME's breach of contract cause of action failed because an anti-assignment clause contained in the County–TVSA contract prohibited the assignment by the County to Hughes–Hunt, and subsequently to SME, of a breach of contract cause of action against TVSA:

 ¶ 11 As a general rule, a contract provision prohibiting the assignment of the contract itself, or of rights and privileges under the contract, does not, unless a different intention is manifested, prohibit the assignment of a claim for damages on account of breach of the contract. *See, e.g., U.S. Indus., Inc. v. Touche Ross & Co.*, 854 F.2d 1223, 1234 (10th Cir.1988); *Rosecrans v. William S. Lozier, Inc.*, 142 F.2d 118, 124 (8th Cir.1944); *Paley v. Cocoa Masonry, Inc.*, 433 So.2d 70, 70–71 (Fla.Dist.Ct.App.1983); *Grady v. Commers Interiors, Inc.*, 268 N.W.2d 823, 825 (S.D.1978); *Ford v. Robertson*, 739 S.W.2d 3, 5 (Tenn.Ct.App.1987); Restatement (Second) of Contracts § 322 (1981); 6 Am.Jur.2d *Assignments* §§ 22, 59 (1999). This rule was adopted by the Utah Supreme Court in *Fuller v. Favorite Theaters Co.*, 119 Utah 570, 230 P.2d 335 (1951) (per curiam). In *Fuller*, the defendant argued that the plaintiff was prohibited from asserting an assigned breach of contract claim against the defendant because the contract expressly prohibited the assignment of the contract without the written consent of the defendant. 119 Utah at 571, 230 P.2d at 336. In rejecting the defendant's argument, this court held that "the provision prohibiting the assignability of the *contract itself* does not affect the assignability of a cause of action which has arisen from the breach." 119 Utah at 572, 230 P.2d at 336; *see also Tanasse v. Snow*, 929 P.2d 351, 354 n. 9 (Utah Ct.App.1996), *rev'd in part on other grounds by Snow, Nuffer, Engstrom & Drake v. Tanasse*, 1999 UT 49, ¶ 12, 980 P.2d 208. The rationale underlying the general rule is that

> parties have the right to select and insist upon the personalities with which they will sustain ... personal relationships. However, such reasoning is valid only so long as such a contract is executory. After it has been performed and the only thing remaining is payment for the services rendered, the contract is no longer one for personal services and the reason for non-assignability no longer exists.

*Prudential Fed. Sav. & Loan Ass'n v. Hartford Accident & Indem. Co.*, 7 Utah 2d 366, 374, 325 P.2d 899, 904 (1958).

¶ 12 However, while acknowledging the general rule enunciated above, courts in other jurisdictions have held that where a contract *expressly* states that the right to sue for breach of contract is non-assignable, full force and effect must be given to such provision. *See, e.g., Allhusen v. Caristo Constr. Corp.*, 303 N.Y. 446, 103 N.E.2d 891, 892–93 (1952); *Cloughly v. NBC Bank–Seguin, N.A.*, 773 S.W.2d 652, 655 (Tex.App.1989). In view of these cases, TVSA argues that the language of the anti-assignment provision at issue in this case, despite the fact that it does not expressly say so, indicates an intent to prevent not merely the assignment of the performance of the contract, but also the assignment of a cause of action for breach of the contract. TVSA notes that unlike the anti-assignment provision in *Fuller*, which merely prohibited the assignment of the "contract itself," the anti-assignment provision in the County–TVSA contract states that neither party shall assign "*its interest in this*

*Agreement.*" (Emphasis added.)[6] This language, TVSA argues, plainly prohibits the County from assigning *any interest* in the County–TVSA contract, which means all interests, including a cause of action for breach of contract. According to TVSA, the term "interest" is the most general term that can be employed to denote a right, claim, or legal share in something, and therefore construing it to apply only to the performance of the contract would essentially render it ineffective.

¶ 13 In contrast, SME argues that the language prohibiting the assignment of any "interest" in the County–TVSA contract must be construed, in accordance with the general rule enunciated in *Fuller*, to mean any interest in the performance of the executory contract and should not, after performance is completed, prohibit the assignment of a cause of action for breach of the contract. In support of its position, SME cites cases from other jurisdictions which have concluded that the term "interest" in a contractual anti-assignment clause does not manifest an intent to prohibit the assignment of the right to sue for breach of contract damages after the contract has been fully performed. *See Lomas Mortgage U.S.A., Inc. v. W.E. O'Neil Constr. Co.,* 812 F.Supp. 841, 844 (N.D.Ill.1993); *Ford,* 739 S.W.2d at 5; *Berschauer/Phillips Constr. Co. v. Seattle Sch. Dist. No. 1,* 124 Wash.2d 816, 881 P.2d 986, 994–95 (1994) (en banc). In view of these cases, SME argues that the anti-assignment provision contained in the County–TVSA contract was drafted with insufficient clarity to prohibit the assignment of a breach of contract cause of action.

¶ 14 The parties' arguments highlight the ambiguities that should have prevented the trial court from granting summary judgment against SME on its breach of contract claim. Indeed, assignments are construed according to well established rules of contract construction. *Winegar v. Froerer*

*Corp.,* 813 P.2d 104, 108 (Utah 1991); 6 Am. Jur.2d *Assignments* § 145 (1999). The basic purpose in construing or interpreting a contract—here an anti-assignment clause—is to determine the intentions of the parties, which are controlling. *Winegar,* 813 P.2d at 108; *John Call Eng'g, Inc. v. Manti City Corp.,* 743 P.2d 1205, 1207 (Utah 1987). Accordingly, we have held that a court may consider extrinsic evidence if the meaning of the contractual provision at issue is ambiguous or uncertain. *See Winegar,* 813 P.2d at 108. "A contract provision is ambiguous if it is capable of more than one reasonable interpretation because of 'uncertain meanings of terms, missing terms, or other facial deficiencies.'" *Id.* (quoting *Faulkner v. Farnsworth,* 665 P.2d 1292, 1293 (Utah 1983)). When ambiguity exists, the intent of the parties becomes a question of fact. *Plateau Mining Co. v. Utah Div. of State Lands & Forestry,* 802 P.2d 720, 725 (Utah 1990). Therefore, in considering a motion for summary judgment, "[f]ailure to resolve an ambiguity by determining the parties' intent from parol evidence is error." *Id.*

¶ 15 Here, the parties have presented contrary, tenable interpretations of the language contained in the anti-assignment provision. *See id.* (stating that to demonstrate ambiguity, "the contrary positions of the parties must each be tenable"); *Grow v. Marwick Dev., Inc.,* 621 P.2d 1249, 1252 (Utah 1980) (same). Accordingly, it is unclear from the language of the provision whether the parties intended to prohibit only the assignment of rights and privileges under the County–TVSA contract, or whether the parties also intended to prohibit the assignment of a cause of action seeking money damages for breach of contract after the contract had been fully performed. Because the intent of the parties is unclear, extrinsic evidence is necessary to determine the meaning of the anti-assignment provision, and the trial court

---

6. Specifically, the anti-assignment clause contained in the County–TVSA contract provides:
 The COUNTY and the CONSULTANT [TVSA] each binds himself, his successors, executors, administrators, and assigns to the other party of this Agreement and to the successors, executors, administrators and assigns of such other party in respect to all of the covenants of the Agreement. *Neither the CONSULTANT [TVSA] nor the COUNTY shall assign, sublet or transfer its interest in this Agreement without the written consent of the other.*
 (Emphasis added.)

erred in granting judgment as a matter of law on this issue.

¶ 16 Therefore, we reverse the trial court's dismissal of SME's breach of contract claim against TVSA and remand this issue to the trial court for a determination of whether the parties intended the anti-assignment clause contained in the County–TVSA contract to prohibit only the assignment of the performance of the contract, or whether it also prohibited the assignment of a cause of action seeking money damages for breach of the contract after the contract had been fully performed. In the event the trial court determines that the anti-assignment provision was intended to prohibit only the assignment of the performance of the contract, and that SME may proceed with its assigned breach of contract claim, SME's damages, if any, are limited to those damages suffered by the County as a result of TVSA's alleged breach of the County–TVSA contract inasmuch as SME may recover only what the County could recover from TVSA per the assignment. Indeed, as is well stated in *American Jurisprudence:* "[T]he assignee is subject to any defenses that would have been good against the [assignor]; the assignee cannot recover more than the assignor could recover; and the assignee *never stands in a better position than the assignor.*" 6 Am.Jur.2d *supra* ¶ 14, at § 144 (emphasis added).

## II. SME'S EXPRESS WARRANTY CLAIM AGAINST TVSA

¶ 17 SME's second claim for relief alleges breach of express warranties purportedly contained in the County–TVSA contract. As explained above, SME was not a party to the County TVSA contract and therefore is pursuing its breach of express warranty claim, like its breach of contract claim, under an assignment by the County of its rights, causes of action, and claims against TVSA to Hughes–Hunt, and Hughes–Hunt's subsequent assignment of such interests to SME. Accordingly, if, on remand, the purported assignment is determined to be invalid due to the anti-assignment provision contained in the County TVSA contract, SME's breach of express warranty claim, like its breach of contract claim, fails as a matter of law. Nev-

ertheless, even assuming the validity of the assignment, the trial court held, and TVSA argues on appeal, that the County TVSA contract contained no express warranties as a matter of law.

¶ 18 Express warranties presuppose that the parties have entered into some kind of contractual agreement, and arise out of promises by the warrantor guaranteeing or assuring a specific result. Specifically, an express warranty has been defined by this court as follows:

A warranty is an assurance by one party to a contract of the existence of a fact upon which the other party may rely. It is intended to relieve the promisee of any duty to ascertain the fact for himself, and it amounts to a promise to answer in damages for any injury proximately caused if the fact warranted proves untrue.

*Groen v. Tri–O–Inc.,* 667 P.2d 598, 604 (Utah 1983); *see also* 17A Am.Jur.2d *Contracts* § 410 (1991). Accordingly, unlike a cause of action in negligence, which is premised on fault, a cause of action for breach of express warranty sounds in strict liability. *See Groen,* 667 P.2d at 604. Therefore, a "person may be liable for breach of warranty despite his exercise of all reasonable or even all possible care." *Id.; Moore v. James,* 5 Utah 2d 91, 94–95, 297 P.2d 221, 222–23 (1956); *see also Chandler v. Bunick,* 279 Or. 353, 569 P.2d 1037, 1039 (1977).

¶ 19 In the instant case, SME argues, relying on various provisions of the County–TVSA contract, that TVSA expressly "assured," "warranted," and "guarantee[d]" that (1) it would perform its services "in full compliance with the latest applicable codes"; (2) it would prepare construction documents "setting forth in detail the work to be accomplished"; (3) it would take responsibility for "any necessary changes to ... designs, drawings and specifications"; (4) it would be "responsible for all of its professional negligent acts"; and (5) its services would be performed "accurately and timely in accordance with industry standards." SME argues that TVSA breached these purported express warranties by preparing defective and incomplete plans and specifications and by unreasonably delaying work on the project.

¶ 20 As an initial matter, in order to recover under a theory of breach of express warranty, plaintiff must prove, in addition to the existence of the warranty, that breach of the warranty is the "direct and proximate cause of the damage." *Mitchell v. Pearson Enters.*, 697 P.2d 240, 247 (Utah 1985); *see also Interwest Constr. v. Palmer,* 923 P.2d 1350, 1357 (Utah 1996). However, in regard to the first provision of the County–TVSA contract cited above—the provision stating that TVSA would perform its services "in full compliance with the latest applicable codes"—SME has made no allegations nor presented any evidence in its amended complaint, in its arguments to the trial court, or in its arguments on appeal that TVSA did not perform its services in full compliance with the latest applicable codes, or that, assuming TVSA did fail to comply with applicable codes, the noncompliance was the proximate cause of its damages. Indeed, SME merely argues that it encountered "problems" with the structural steel portions of the plans and specifications provided by TVSA due to defects and inaccuracies in the plans; that these problems required the preparation and submittal of numerous RFIs and requests for change orders, which caused considerable delay; and that, consequently, SME was damaged. However, a multitude of "problems" with a design professional's plans and specification may occur that have little or nothing to do with violations of applicable building codes. Therefore, while we do not decide the issue of whether the above contractual provision creates an express warranty, summary judgment was nevertheless properly granted with regard to this provision. *See Mitchell,* 697 P.2d at 247 (dismissing plaintiff's breach of express warranty claim for failure to offer evidence that breach of the warranty was the proximate cause of damages); *Interwest Constr. v. Palmer,* 886 P.2d 92, 98–100 (Utah Ct.App.1994) (same).

¶ 21 In regard to the remaining provisions of the County–TVSA contract cited by SME as the basis of its express warranty claim, we note that although SME uses the words "assured," "warranted," and "guarantee[d]" to describe the relevant provision of the County–TVSA contract, the words do not appear anywhere in the referenced contractual provisions themselves. Moreover, although SME correctly notes that the creation of an express warranty does not necessarily require the use of any particular words, it does require a "direct and positive affirmation of fact" made by the warrantor with regard to the quality or condition of the goods or services provided, i.e., an affirmation of fact guaranteeing or assuring a specific result. *See Groen,* 667 P.2d at 606. However, even when viewed in the light most favorable to SME, the remaining provisions of the County–TVSA contract cited by SME do not contain "direct and positive affirmations of fact" guaranteeing, assuring, or warranting that the services TVSA provided under the County–TVSA contract would be complete, free from defects, or suited for their intended use. Indeed, the contractual provisions cited by SME merely state that TVSA would *prepare* plans and specifications, make necessary changes to the plans and specifications, take responsibility for its professional negligent acts, and perform the above services in accordance with industry standards. Nowhere in the above provisions, or in the remaining sections of the County–TVSA contract, does TVSA guarantee, assure, or warrant a specific result. Accordingly, the above provisions can be viewed only as setting forth TVSA's obligations to *provide* specific services, not, as SME urges us to view them, as setting forth express warranties guaranteeing that the services provided would be free from defects or inaccuracies. To hold otherwise would essentially turn every basic contractual promise, duty, or obligation in the County–TVSA contract into a warranty under which TVSA would be strictly liable, despite the "exercise of all reasonable or even all possible care." *Groen,* 667 P.2d at 604.

¶ 22 In view of the above, we conclude that SME has presented insufficient evidence of the existence of an express warranty in the County–TVSA contract. Therefore, the trial court correctly granted summary judgment in favor of TVSA on SME's breach of express warranty claim.

## III. SME'S IMPLIED WARRANTY CLAIM AGAINST TVSA

¶ 23 SME's second claim for relief, in addition to asserting a claim for breach of express warranty, also asserts a claim for breach of implied warranty against TVSA. Like its express warranty claim, SME alleges that TVSA impliedly warranted that the plans and specifications provided under its contract with the County were "correct, accurate, properly coordinated, in conformance with all applicable codes, regulations and laws and suitable for their intended use." Moreover, SME further alleged that TVSA impliedly warranted that it would not "unreasonably hinder, delay, obstruct or interfere with the performance of the work ... on the Project." The trial court dismissed SME's implied warranty claim, holding that architects cannot be liable under a theory of implied warranty as a matter of law.

¶ 24 As a matter of history, "warranties developed in the context of the commercial sale of goods."[7] *Groen v. Tri–O–Inc.,* 667 P.2d 598, 604 (Utah 1983) (citing Utah Code Ann. §§ 70A–2–312 to –318 (1981); *Aced v. Hobbs–Sesack Plumbing Co.,* 55 Cal.2d 573, 12 Cal.Rptr. 257, 360 P.2d 897, 902 (1961); *Gagne v. Bertran,* 43 Cal.2d 481, 275 P.2d 15, 19 (1954)); *see also* Utah Code Ann. §§ 70A–2–312 to –318 (1997). The contract at issue here, as SME acknowledges, does not involve the sale of goods, and SME does not rely on the implied warranties set out in the Uniform Commercial Code. Rather, SME urges us to extend our law of implied warranty and hold that an architect or design professional impliedly warrants a perfect plan or satisfactory result.

¶ 25 Despite SME's argument, a solid majority of jurisdictions have refused to hold that architects and design professionals impliedly warrant perfect plans or satisfactory results, but rather, limit the liability of architects to those situations in which the professional is negligent in the provision of his or her services. Indeed, the rule was stated as

early as 1896 by the Supreme Court of Maine:

> The responsibility resting on an architect is essentially the same as that which rests upon the lawyer to his client, or upon the physician to his patient.... The undertaking of an architect implies that he possesses skill and ability, including taste, sufficient to enable him to perform the required services at least ordinarily and reasonably well; and that he will exercise and apply, in the given case, his skill and ability, his judgment and taste, reasonably and without neglect. *But the undertaking does not imply or warrant a satisfactory result.... There is no implied promise that miscalculations may not occur.*

*Coombs v. Beede,* 89 Me. 187, 36 A. 104, 104–05 (1896) (emphasis added); *see also, e.g., Gravely v. Providence Partnership,* 549 F.2d 958, 960 (4th Cir.1977); *R.J. Longo Constr. Co. Inc. v. Transit America, Inc.,* 921 F.Supp. 1295, 1310 (D.N.J.1996) (and cases cited therein); *Johnson–Voiland–Archuleta, Inc. v. Roark Assocs.,* 40 Colo.App. 269, 572 P.2d 1220, 1221 (1977); *Audlane Lumber & Builders Supply, Inc. v. D.E. Britt Assocs., Inc.,* 168 So.2d 333, 335 (Fla.Dist.Ct.App. 1964), *cert. denied,* 173 So.2d 146 (Fla.1965); *Klein v. Catalano,* 386 Mass. 701, 437 N.E.2d 514, 525 (Mass.1982); *Borman's, Inc. v. Lake State Dev. Co.,* 60 Mich.App. 175, 230 N.W.2d 363, 368 (1975); *City of Mounds View v. Walijarvi,* 263 N.W.2d 420, 424 (Minn.1978); *Queensbury Union Free Sch. Dist. v. Jim Walter Corp.,* 91 Misc.2d 804, 398 N.Y.S.2d 832, 835 (N.Y.Sup.Ct.1977); *State ex rel. Risk Mgmt. Div. v. Gathman–Matotan Architects & Planners, Inc.,* 98 N.M. 790, 653 P.2d 166, 170 (N.M.Ct.App.), *cert. quashed,* 99 N.M. 47, 653 P.2d 878 (1982); *Ryan v. Morgan Spear Assocs., Inc.,* 546 S.W.2d 678, 681 (Tex.Civ.App.1977); *Kemper Architects, P.C. v. McFall, Konkel & Kimball Consulting Eng'rs, Inc.,* 843 P.2d 1178, 1186 (Wyo. 1992).

¶ 26 The majority rule articulated in *Coombs* was restated by this court in *Nauman v. Harold K. Beecher & Associates,* 24

---

7. However, warranties have now been recognized in circumstances other than the sale of goods, such as the warranty of fitness generally implied in the lease or bailment for hire of chattels, and the warranty of habitability implied in the sale of a new home. *See Groen v. Tri–O–Inc.,* 667 P.2d 598, 604 (Utah 1983).

Utah 2d 172, 467 P.2d 610 (1970). *Nauman,* as SME correctly notes, involved a negligence claim against an architect, not an implied warranty claim. However, in adjudicating the negligence claim, this court stated:

> "[T]he responsibility of an architect does not differ from that of a lawyer or physician. When he possesses the requisite skill and knowledge, and in the exercise thereof has used his best judgment, he has done all the law requires. *The architect is not a warrantor of his plans and specifications.*"

24 Utah 2d at 179, 467 P.2d at 615 (emphasis added) (quoting *Bayne v. Everham,* 197 Mich. 181, 163 N.W. 1002, 1008 (Mich.1917)).

¶ 27 Sound policy concerns support the validity of the majority view articulated by this court in *Nauman.* As the Minnesota Supreme Court aptly stated in *City of Mounds View:*

> Architects, doctors, engineers, attorneys, and others deal in somewhat inexact sciences and are continually called upon to exercise their skilled judgment in order to anticipate and provide for random factors which are incapable of precise measurement. The indeterminate nature of these factors makes it impossible for professional service people to gauge them with complete accuracy in every instance.... Because of the inescapable possibility of error which inheres in these services, the law has traditionally required, not perfect results, but rather the exercise of that skill and judgment which can be reasonably expected from similarly situated professionals.

263 N.W.2d at 424.

¶ 28 Therefore, consistent with *Nauman,* we hold that architects and design professionals do not impliedly warrant or guarantee a perfect plan or satisfactory result. Accordingly, the trial court correctly held that SME's implied warranty claim against TVSA is barred to the extent it argues that TVSA impliedly warranted or guaranteed that the plans and specifications it provided under the County–TVSA contract were free from defects or inaccuracies.

¶ 29 However, although architects do not impliedly warrant or guarantee a perfect plan or satisfactory result, many courts in other jurisdictions have recognized that when architects or design professionals bind themselves by contract to do a work or to perform a service, they agree by implication to use reasonable care and skill in doing it. *See, e.g., Klein,* 437 N.E.2d at 526 (holding that architects provide "an implied warranty that they [will] exercise the standard of care required of their profession"); *City of Mounds View,* 263 N.W.2d at 424 " 'One who undertakes to render professional services is under a duty to the person for whom the service is to be performed to exercise such care, skill, and diligence as men in that profession ordinarily exercise under like circumstances.' " (quoting *City of Eveleth v. Ruble,* 302 Minn. 249, 225 N.W.2d 521, 524 (1974)); *Gathman–Matotan,* 653 P.2d at 169 ("The professional is usually employed to exercise the customary or reasonable skills of his profession for a particular job. He 'warrants' his work only to the extent that he will use the skill customarily demanded of his profession."). Moreover, these courts have held that breach of the implied warranty or duty to use reasonable or customary care in the provision of professional services gives rise to an action *under contract* for negligent services. *See Klein,* 437 N.E.2d at 526; *Gathman–Matotan,* 653 P.2d at 170. We find the reasoning of the above courts to be persuasive, and adopt it here.

¶ 30 Therefore, although the trial court correctly held that SME's implied warranty claim is barred to the extent it argues that TVSA impliedly warranted or guaranteed a perfect plan or satisfactory result, the trial court erred in failing to allow the claim to proceed to the extent it argues that TVSA breached an implied promise or duty to use reasonable and customary care in performing professional services under the County–TVSA contract. However, the implied duty to use reasonable and customary care in the provision of professional services arising from contract is owed only to the person or entity for whom the professional services are to be rendered—in this case the County. *See City of Mounds View,* 263 N.W.2d at 424; *Adobe Masters, Inc. v. Downey,* 118 N.M.

547, 883 P.2d 133, 134 (1994). Therefore, SME may proceed with its implied warranty claim only if, on remand, the trial court determines that the County's assignment of its claims to Hughes–Hunt, and Hughes–Hunt's subsequent assignment of such interests to SME, is valid. Moreover, because SME's implied warranty claim is an assigned claim, SME may not recover the damages *it* suffered as a result of TVSA's alleged breach of the implied warranty to use reasonable and customary care in the performance of contractual duties under the County–TVSA contract. Rather, SME's recovery, if any, is limited to those damages the *County* suffered as a result of TVSA's alleged breach of the implied warranty to exercise reasonable and customary care. *See* 6 Am.Jur.2d *Assignments* § 144 (1999) (stating that an assignee can acquire no right superior to those held by the assignor, and "simply stands in the shoes of the assignor").

## IV. SME'S TORT CLAIMS AGAINST TVSA, GSBS, AND REAVELEY

¶ 31 SME's third claim for relief alleges negligent interference with advantageous economic interests against TVSA. SME's fourth claim alleges professional negligence against all members of the design team. The trial court dismissed all such direct and assigned claims, reasoning that the economic loss rule prevented SME from recovering purely economic damages in tort.

¶ 32 The economic loss rule is a judicially created doctrine that marks the fundamental boundary between contract law, which protects expectancy interests created through agreement between the parties, and tort law, which protects individuals and their property from physical harm by imposing a duty of reasonable care. *See American Towers Owners Ass'n, Inc. v. CCI Mech., Inc.,* 930 P.2d 1182, 1190 (Utah 1996). Simply put, the economic loss rule holds that "economic damages are not recoverable in negligence absent physical property damage or bodily injury."[8] *Id.* at 1189; *see also* W. Page Keeton et al., *Prosser & Keeton on the*

*Law of Torts* § 92, at 657 (5th ed.1984); 86 C.J.S. *Torts* § 26 (1997). Economic loss has been defined as

> "[d]amages for inadequate value, costs of repair and replacement of the defective product, or consequential loss of profits—without any claim of personal injury or damage to other property ... as well as 'the diminution in the value of the product because it is inferior in quality and does not work for the general purposes for which it was manufactured and sold.'"

*American Towers,* 930 P.2d at 1189 (quoting *Maack v. Resource Design & Constr., Inc.,* 875 P.2d 570, 579–80 (Utah Ct.App.1994) (citation omitted)).

¶ 33 In the instant case, SME does not deny that its tort claims against the design team seek to recover what we have termed economic loss. Nevertheless, SME argues that its tort claims should be allowed because the economic loss rule is rooted in products liability law, and therefore should not be extended to bar professional negligence claims brought by contractors or subcontractors against design professionals.

¶ 34 Although SME correctly notes that the genesis of the economic loss rule is found in the law of products liability, it ignores the fact that the economic loss rule has been applied in other contexts. Indeed, in *American Towers,* this court applied the economic loss rule to bar a tort claim by a condominium owners' association against the architects who designed the plumbing and mechanical systems of the condominium complex. *Id.* at 1192. In doing so, this court did not classify the condominium units at issue as products. To the contrary, while the *American Towers* opinion traced the economic loss rule to its roots in products liability law, it specifically noted that the condominium owners' claims involved allegations of "negligent design and construction of improvements to real property, *not the negligent manufacturing of a product.*" *Id.* at 1190 (emphasis added).

¶ 35 In extending the economic loss rule outside the products liability context, *Ameri-*

---

8. However, plaintiffs may recover purely economic losses in cases involving intentional torts such as fraud, business disparagement, and intentional interference with contract. *American Towers,* 930 P.2d at 1190 n. 11.

*can Towers* explained that the rationales underlying the doctrine are particularly applicable in the construction setting:

> Construction projects are characterized by detailed and comprehensive contracts that form the foundation of the industry's operations. Contracting parties are free to adjust their respective obligations to satisfy their mutual expectations. For example, a developer can contract for low-grade materials that meet only minimum requirements of the building code. When the developer sells those units, a buyer should not be able to turn around and sue the builder for the poor quality of construction. Presumably the buyer received what he paid for or he can bring a contract claim against his seller. Meanwhile, if the developer has a problem with the builder, he too will have a contract remedy. A buyer can avoid economic loss resulting from defective construction by obtaining a thorough inspection of the property prior to purchase and then by either obtaining insurance or by negotiating a warranty or reduction in price to reflect the risk of any hidden defects.

*Id.* (citations omitted). Recognizing these realities, we concluded in *American Towers* that relief for defeated economic expectations under a design or construction contract was to come from the contract itself, not from third parties. *Id.* We reasoned that to conclude otherwise would essentially impose the plaintiffs' "economic expectations upon parties whom the [plaintiffs] did not know and with whom they did not deal and upon contracts to which they were not a party." *Id.* at 1192; *see also Maack*, 875 P.2d at 581 (holding owner's tort claim against architect barred by economic loss rule); *Schafir v. Harrigan*, 879 P.2d 1384, 1388 (Utah Ct.App. 1994) (applying the economic loss rule outside the context of negligent manufacture); *accord Ramerth v. Hart*, 133 Idaho 194, 983 P.2d 848, 851 (Idaho 1999) (stating that "[t]he economic loss rule applies to negligence cases in general; its application is not restricted to products liability cases").

¶ 36 Despite the above, SME argues that the rationale enunciated in *American Towers* for extending the economic loss rule outside the products liability context is inapplicable in this case because *American Towers* involved remote purchasers' claims against an architect, not, like the instant case, a subcontractor's professional malpractice claim against an architect. However, all parties to a construction project, not just the buyers and developers at issue in *American Towers*, resort to contracts and contract law to protect their economic expectations. Indeed, this is particularly true with contractors and subcontractors whose fees are founded upon their "expected liability exposure as bargained and provided for in the[ir] contract[s]." *Berschauer/Phillips Constr. Co. v. Seattle Sch. Dist. No. 1*, 124 Wash.2d 816, 881 P.2d 986, 992 (1994) (en banc). Protection against economic losses caused by another's failure to properly perform, including an architect or design professional, is but one provision a contractor, subcontractor, or sub-subcontractor may require in striking his or her bargain. Accordingly, contractors' negligence claims against architects—like the owners' negligence claims against architects in *American Towers*—are akin to the types of commercial situations to which the economic loss rule was meant to apply. *See id.* at 990 (noting that the "economic loss rule was developed to prevent disproportionate liability and *allow parties to allocate risk by contract*" (emphasis added)).

¶ 37 Moreover, in view of the contractual foundation of the construction industry, and the ability of contractors and subcontractors to negotiate toward the risk distribution that is desired or customary, other jurisdictions have specifically applied the economic loss doctrine to bar contractors' and subcontractors' malpractice claims against architects and design professionals. *See, e.g., Fleischer v. Hellmuth, Obata & Kassabaum, Inc.*, 870 S.W.2d 832, 837 (Mo.Ct.App.1993) (rejecting contractor's negligence claim against architect under economic loss rule); *Floor Craft Floor Covering, Inc. v. Parma Cmty. Gen. Hosp. Ass'n*, 54 Ohio St.3d 1, 560 N.E.2d 206, 212 (1990) (same); *Bernard Johnson, Inc. v. Continental Constructors, Inc.*, 630 S.W.2d 365, 374 (Tex.App.1982) (same); *Blake Constr. Co. v. Alley*, 233 Va. 31, 353 S.E.2d 724, 727 (1987) (same); *Berschauer/Phillips Constr. Co.*, 881 P.2d at 992 (same); *Rissler*

& McMurry Co. v. Sheridan Area Water Supply Joint Powers Bd., 929 P.2d 1228, 1235 (Wyo.1996) (same).

¶ 38 Therefore, consistent with our prior analysis in *American Towers*, and the foregoing authority from other jurisdictions, we hold that the general rule in this jurisdiction prohibiting the recovery of purely economic loss in negligence is applicable to a contractor's or subcontractor's negligence claim against a design professional (e.g., an architect or engineer).[9]

¶ 39 Alternatively, assuming the economic loss rule does extend to tort suits against design professionals, SME requests that this court apply section 552 of the Restatement (Second) of Torts to permit a subcontractor to bring a tort cause of action alleging purely economic damages against a design professional for negligent misrepresentation.[10]

¶ 40 Specifically, section 552 states:

Information Negligently Supplied for the Guidance of Others

(1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

(2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered

(a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

(b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

(3) The liability of one who is under a public duty to give the information extends to loss suffered by any of the class of persons for whose benefit the duty is created, in any of the transactions in which it is intended to protect them.

Restatement (Second) of Torts § 552 (1977).

¶ 41 We acknowledge, as SME notes, that this court has under certain circumstances recognized that economic losses are recoverable in tort under section 552. *See, e.g., Price–Orem Inv. Co. v. Rollins, Brown & Gunnell, Inc.*, 713 P.2d 55, 59 (Utah 1986) (holding that a third party had standing to bring, and had sufficiently stated, a cause of action for negligent misrepresentation against a surveyor); *Milliner v. Elmer Fox & Co.*, 529 P.2d 806, 808 (Utah 1974) (citing a tentative draft of section 552 for the proposition that third parties may bring negligent misrepresentation claims against accountants). We also acknowledge that courts in other jurisdictions have allowed the recovery of economic losses in the construction industry under section 552. *See, e.g., Gulf Contracting v. Bibb County*, 795 F.2d 980, 982 (11th Cir.1986) (per curiam) (applying Georgia law); *Village of Cross Keys, Inc. v. United States Gypsum Co.*, 315 Md. 741, 556 A.2d 1126, 1133–35 (1989); *John Martin Co. v.*

---

9. SME argues that this holding will overrule "the entire law of professional negligence in the state of Utah." However, the issue of whether the economic loss rule bars claims against other professionals, such as lawyers and accountants, is not before us, and we do not decide it. Nevertheless, we do note that other courts dealing with this issue have concluded that professionals, such as attorneys, accountants, and health care providers, are distinguishable from architects, and that cases applying the economic loss rule in the construction setting do not "signal in general the end of malpractice recovery in tort." *2314 Lincoln Park West Condominium Ass'n v. Mann, Gin, Ebel & Frazier, Ltd.*, 136 Ill.2d 302, 144 Ill.Dec.

227, 555 N.E.2d 346, 353 (1990), *cited by American Towers*, 930 P.2d at 1192; *see also Klass v. Winstein, Kavensky, Wallace & Doughty*, 219 Ill. App.3d 817, 161 Ill.Dec. 817, 579 N.E.2d 365, 369 (1991) (holding that legal malpractice claims are not akin to the types of commercial transactions to which the economic loss doctrine was meant to apply). Moreover, we note that this court has applied the law of attorney malpractice in cases decided after *American Towers*. *See Glencore, Ltd. v. Ince*, 972 P.2d 376 (Utah 1998).

10. SME's amended complaint does not allege a claim for negligent misrepresentation.

*Morse/Diesel, Inc.,* 819 S.W.2d 428, 432–34 (Tenn.1991).

¶ 42 However, despite the above, several other jurisdictions considering this issue have concluded that, in the context of construction litigation regarding the alleged negligence of design professionals, a tort for negligent misrepresentation alleging damages based purely on economic loss is not available. For example, in *Berschauer/Phillips,* considering circumstances nearly identical to those before us, the Washington Supreme Court refused to apply section 552 to permit a subcontractor not in privity of contract to bring a tort cause of action against a design professional. 881 P.2d at 993. Although it acknowledged that section 552 is recognized in Washington, the court stated:

> There is a beneficial effect to society when contractual agreements are enforced and expectancy interests are not frustrated. In cases involving construction disputes, the contracts entered into among the various parties shall govern their economic expectations. The preservation of the contract represents the most efficient and fair manner in which to limit liability and govern expectations in the construction business.
>
> . . . .
>
> ... [Therefore,] [w]e hold that when parties have contracted to protect against potential economic liability, as is the case in the construction industry, *contract principles override the tort principles in § 552 and, thus, purely economic damages are not recoverable.*

*Id.* (emphasis added).

¶ 43 Similarly, in *Rissler & McMurry,* the Wyoming Supreme Court, again considering nearly identical facts to those before us, also rejected the application of section 552 in the construction setting:

> [W]e hold that when the plaintiff has contracted to protect against economic liability caused by the negligence of the defendant, there is no claim under [section 552 of the Restatement (Second) of Torts] for purely economic loss. We believe that this ruling not only encourages the parties to negotiate the limits of liability in a contractual

situation, but it holds the parties to the terms of their agreement.

929 P.2d at 1235; *see also Williams & Sons Erectors, Inc. v. South Carolina Steel Corp.,* 983 F.2d 1176, 1181 (2d Cir.1993) (finding under New York law, section 552 not adopted to permit a contractor to recover from an architect); *Floor Craft Floor Covering, Inc. v. Parma Cmty. Gen. Hosp. Ass'n,* 54 Ohio St.3d 1, 560 N.E.2d 206, 212 (1990) (holding that subcontractor could not recover economic losses against design professional under section 552).

¶ 44 We find the reasoning of the *Berschauer/Phillips* and *Rissler & McMurry* courts to be persuasive. Like the above courts, we have consistently emphasized the importance of the parties' right to negotiate the terms of a contract, limited only by statutory prohibitions or public policy. *See, e.g., American Towers,* 930 P.2d at 1190; *Bekins Bar V Ranch v. Huth,* 664 P.2d 455, 459 (Utah 1983); *Biesinger v. Behunin,* 584 P.2d 801, 803 (Utah 1978). We have also consistently recognized that parties must abide by the terms of their respective contracts. *See, e.g., Geisdorf v. Doughty,* 972 P.2d 67, 71 (Utah 1998); *Johnson v. Carman,* 572 P.2d 371, 373 (Utah 1977); *Diamond T. Utah, Inc. v. Canal Ins. Co.,* 12 Utah 2d 37, 40, 361 P.2d 665, 667 (1961); *Shell Oil Co. v. Stiffler,* 87 Utah 176, 184–85, 48 P.2d 503, 507 (1935). Were we to recognize a cause of action under section 552, however, parties could essentially sidestep contractual duties by bringing a cause of action in tort to recover the very benefits they were unable to obtain in contractual negotiations. Moreover, we see no principled reason why the application of section 552 would not extend liability beyond contractors and subcontractors to an unlimited number of materialmen and workmen who suffer economic injury as a result of a design professional's alleged negligence, which is precisely the type of situation the economic loss rule was designed to prevent. Therefore, to maintain the fundamental boundary between tort and contract law, we hold that when parties have contracted, as in the construction industry, to protect against economic liability, contract principles override the tort principles enunciated in section 552

of the Restatement (Second) of Torts and, thus, economic losses are not recoverable.

¶ 45 Turning to the facts of this case, the gravamen of SME's negligence claims is dissatisfaction with the plans and specifications prepared by the design team. Indeed, SME acknowledges that its tort claims seek purely economic damages, unaccompanied by any claim of personal injury or damage to other property. Moreover, although SME did not contract with TVSA, GSBS, or Reaveley for the design of the project and therefore had no opportunity to negotiate directly with the design team regarding the limits of liability, it did have the opportunity to allocate the risks associated with the costs of the work when it entered into a subcontract agreement with Hughes–Hunt, which proved to be an adequate contractual remedy considering the fact that SME settled with Hughes–Hunt for $150,000 and the assignment of Hughes–Hunt's claims. Therefore, we conclude that the trial court correctly dismissed SME's direct and assigned negligence claims against the design team under the economic loss rule. "To allow the claim[s] would be to impose [SME's] economic expectations upon parties whom [SME] did not know and with whom [it] did not deal and upon contracts to which [it] was not a party." *American Towers*, 930 P.2d at 1192. Accordingly, SME's recovery of economic losses is limited to those damages recoverable from Hughes–Hunt, and to any assigned contractual claims that survive this appeal on remand.

### V. SME'S BREACH OF THIRD–PARTY BENEFICIARY CLAIMS AGAINST TVSA, GSBS, AND REAVELEY

¶ 46 SME's fifth and final claim alleges direct and assigned rights of a third-party beneficiary under the County TVSA, TVSA–GSBS, and TVSA–Reaveley contracts. Specifically, SME argues that it has enforceable third-party beneficiary rights under the respective contracts because (1) the County–

TVSA contract was expressly incorporated into the TVSA–GSBS and TVSA–Reaveley contracts, making the County a third-party beneficiary of the TVSA–GSBS and TVSA–Reaveley contracts, and SME, as assignor of the County, assumes the County's status,[11] and (2) even if SME, standing in the shoes of the County, does not have a third-party beneficiary claim, SME, as subcontractor to and assignee of Hughes–Hunt, was an intended third-party beneficiary of the County–TVSA, TVSA–GSBS, and TVSA–Reaveley contracts.[12]

¶ 47 "Third-party beneficiaries are 'persons who are recognized as having enforceable rights created in them by a contract to which they are not parties and for which they give no consideration.'" *Rio Algom Corp. v. Jimco Ltd.*, 618 P.2d 497, 506 (Utah 1980) (quoting 4 Arthur L. Corbin, *Corbin on Contracts* § 774, at 6 (1960)). For a third party to have enforceable rights under a contract, "the intention of the contracting parties to confer a *separate and distinct benefit* upon the third party must be clear." *Id.* (emphasis added); *see also American Towers Owners Assoc., Inc. v. CCI Mech., Inc.*, 930 P.2d 1182, 1188 (Utah 1996); *Ron Case Roofing & Asphalt Paving, Inc. v. Blomquist*, 773 P.2d 1382, 1386 (Utah 1989). Accordingly, a party only incidentally benefitted has no right to recover under the contract. *American Towers*, 930 P.2d at 1188; *Rio Algom*, 618 P.2d at 506. Indeed, this court has stated that "'[i]t is not enough that the parties to the contract know, expect or even intend that others will benefit from the [contract].... The contract must be undertaken for the plaintiff's direct benefit and the contract itself must affirmatively make this intention clear.'" *American Towers*, 930 P.2d at 1188 (quoting *155 Harbor Drive Condominium Ass'n v. Harbor Point, Inc.*, 209 Ill.App.3d 631, 154 Ill.Dec. 365, 568 N.E.2d 365, 374–75 (1991)).

---

11. Because this is a County-assigned claim, it is subject to the anti-assignment provision contained in the County–TVSA contract. However, because the trial court determined that this claim failed as a matter of law on other grounds, we address it. *See supra* part II.

12. Apparently, SME also alleged that it was a third-party beneficiary under employment agreements between GSBS and Jonathan Bradshaw and Reaveley and Earl S. Eppich. However, these arguments are abandoned on appeal, and therefore, we do not address them.

¶ 48 Turning to the facts of this case, neither the TVSA–GSBS contract nor the TVSA–Reaveley contract evidences any intention on the part of the contracting parties to confer a separate and distinct benefit upon the County. Indeed, it is undisputed that GSBS refused to sign its contract with TVSA because the contract did not contain, among other things, an express disclaimer of any intention to create contractual rights in third parties, including the County. Moreover, even assuming, as SME argues, that GSBS is nevertheless bound by the TVSA–GSBS contract because it performed in accordance with the terms of the contract, SME has failed to cite to any contractual language in the TVSA–GSBS or the TVSA–Reaveley contract evidencing an intent to confer a direct benefit on the County that was "separate and distinct" from those conferred upon TVSA. Rather, an examination of the terms of the TVSA–GSBS and TVSA–Reaveley contracts indicates that the contracts were undertaken not for the County's direct benefit, but for the sole benefit of TVSA. At most, the County was merely an incidental beneficiary of the TVSA–GSBS and TVSA–Reaveley contracts.

¶ 49 Similarly, there is nothing in the County–TVSA, TVSA–GSBS, and TVSA–Reaveley contracts suggesting that the contracting parties clearly and affirmatively contracted to confer a separate and distinct benefit upon SME or Hughes–Hunt. To the contrary, the County–TVSA contract, which SME argues was expressly incorporated into the TVSA–GSBS and TVSA–Reaveley contracts, explicitly disclaims any independent duty or liability to the contractors or subcontractors working on the project. Specifically, the contract states:

> It is understood and agreed that the CONSULTANT's services under this agreement ... *shall not create for the CONSULTANT any independent duties, liabilities, agreements, or rights to or with the contractor, subcontractor, their employees, or any third persons.*

(Emphasis added.) If TVSA owed no duties to SME and Hughes–Hunt, obviously TVSA's consultants could not owe any duties to SME or Hughes–Hunt in the performances of the same services.

¶ 50 Despite the contractual disclaimer of independent duties to third parties, SME argues that TVSA, GSBS, and Reaveley generally knew that a contractor and/or one or more subcontractors involved in constructing the project would use their design documents to build portions of the project, and that this is sufficient to create third-party beneficiary rights in SME. However, as we held in *American Towers,* " 'With respect to construction contracts ... [i]t is not enough that the parties to the contract know, expect or even intend that others will benefit.... The contract must be undertaken for the plaintiff's direct benefit and the contract itself must affirmatively make this intention clear.' " 930 P.2d at 1188 (quoting *155 Harbor Drive Condominium Ass'n,* 154 Ill.Dec. 365, 568 N.E.2d at 374–75); *accord Detweiler Bros. v. John Graham & Co.,* 412 F.Supp. 416, 419 (E.D.Wash.1976) (holding that owner-architect contract did not create third-party beneficiary rights in subcontractor); *Collins Co. v. City of Decatur,* 533 So.2d 1127, 1132–34 (Ala.1988) (holding that owner-architect contract did not create enforceable third-party beneficiary rights in contractor); *Linde Enters., Inc. v. Hazelton City Auth.,* 412 Pa.Super. 67, 602 A.2d 897, 900–01 (1992) (holding that owner-engineer contract did not create enforceable third-party rights in general contractor); *Valley Landscape Co. v. Rolland,* 218 Va. 257, 237 S.E.2d 120, 122–24 (1977) (holding that owner-landscape architect contract did not create third-party rights in contractor).

¶ 51 In sum, the respective contracts at issue in this case do not evidence an intent on the part of the contracting parties to confer a separate and distinct benefit upon the County, Hughes–Hunt, or SME. Accordingly, the trial court correctly dismissed SME's direct and assigned breach of third-party beneficiary claims against TVSA, GSBS, and Reaveley as a matter of law.

## CONCLUSION

¶ 52 We affirm the trial court's conclusions that (1) the County–TVSA contract contained no express warranties as a matter of law; (2) the economic loss rule bars SME's direct and

assigned negligence claims against the design team; and (3) the respective contracts at issue in this case do not evidence an intent on the part of the contracting parties to confer a separate and distinct benefit upon the County, Hughes–Hunt, or SME and that, therefore, SME's direct and assigned breach of third-party beneficiary claims against TVSA, GSBS, and Reaveley fail as a matter of law. However, we reverse the trial court's dismissal of SME's County-assigned breach of contract and breach of implied warranty claims against TVSA, and remand these issues for a determination of whether the parties intended the anti-assignment provision contained in the County TVSA contract to prohibit the assignment of a breach of contract cause of action after the contract had been fully performed. If the trial court determines that the County's assignment of its claims to SME was valid, SME may proceed with its breach of contract and breach of implied warranty claims in a manner consistent with this opinion.

¶ 53 Justice DURHAM, Justice DURRANT, Justice WILKINS, and Judge TAYLOR concur in Associate Chief Justice RUSSON's opinion.

¶ 54 Having disqualified himself, Chief Justice HOWE does not participate herein; District Judge TAYLOR sat.